# Erdman *v.* Mitchell, Appellant.

207
214

79
1355

*Trades unions—Strikes—Union against union—Conspiracy.*

An agreement by a number of persons that they will by threats and strikes deprive a mechanic of the right to work for others merely because he does not choose to join a particular union, is a conspiracy to commit an unlawful act, which conspiracy may be restrained.

Members of an incorporated trade union, members of an unincorporated trade union, and non-union men were all working on a large and expensive building. After the building had progressed to a critical stage in its

construction, a strike was ordered by the unincorporated union and two thirds of the men quit work. The managers of the unincorporated union called upon the contractors and an arrangement was entered into that if the incorporated union men were discharged the strike would be called off. This arrangement was carried out and work was resumed, non-union men being continued on. Subsequently the unincorporated union announced that they would pursue the same course in future and drive every member of the incorporated union into the unincorporated union. *Held*, that a court of equity would interfere by injunction to protect the members of the incorporated union.

Under the declaration of rights of the constitution of Pennsylvania, the right of a workman to the free use of his hands is a right which neither the legislature or a trade union can take from him, and one which it is the bounden duty of the courts to protect.

Trades unions may cease to work for reasons satisfactory to their members, but if they combine to prevent others from obtaining work by threats of a strike, or combine to prevent an employer from employing others by threats of a strike, they combine to accomplish an unlawful purpose, a purpose as unlawful now as it ever was, though not punishable by indictment. Such combination is a despotic and tyrannical violation of the indefeasible right of labor to acquire property which courts are bound to restrain. It is utterly subversive of the letter and spirit of the declarations of rights. If such combination be in accord with the law of the trades unions, then that law and the organic law of the people of a free commonwealth cannot stand together; one or the other must go down. Per DEAN, J.

Argued March 30, 1903. Appeal, No. 36, Jan. T., 1903, by defendant, from decree of C. P. No. 3, Phila. Co., Dec. T., 1901, No. 2669, on bill in equity in case of William C. Erdman et al. v. Robert T. Mitchell et al. Before MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Bill in equity for an injunction. Before McCARTHY, J.

The court found the facts to be as follows :

The following facts are clearly established from the pleadings and proofs :

1. The defendants are members of an unincorporated association of workmen, known as the council of the Allied Building Trades of Philadelphia and Vicinity. This association will hereinafter be referred to as the Allied Trades. Its members are delegates chosen by trades unions of workmen " engaged in the building trades."

The objects and purposes of the Allied Trades sufficiently appear in the " constitution and by-laws " of the association,

which was placed in evidence at the trial. The portions of this instrument which have special bearing upon the case at bar are set out in the following extracts: The preamble recites that "the ownership and management of all industry is being placed on an organized basis, to the end that competition shall be replaced by unity of action," and declares, among other things, that "it behooves us as intelligent men to more thoroughly organize the 'workman' who makes the profits of all industry possible. Each union in a city should be allied with the other in the Central Council and following this to its logical end, each central council of every city should be allied with the other in such a manner as would grant to each city or locality the right of local autonomy with the allied support of the entire world." "We earnestly invite all organizations of workmen engaged in the building trades to join us in our efforts to build a permanent edifice until there shall be no man working in the building trades that does not own allegiance to the council of the allied building trades of Philadelphia and vicinity." By article VII of the constitution the president is required, with the consent of the council, to appoint certain standing committees, among them an "organization committee of ten members." Article VIII prescribes the duties of committees, and section 3 is as follows: "The organization committee shall endeavor to organize any building trade that is not organized; they shall endeavor to get all building trades unions not affiliated with this council to affiliate with same," etc. Article XVI on "Trade Rules" contains the following sections: "Section 1. It shall be the special duty of this council to use the united strength of all trades represented herein to induce all non-union men to conform to and obey the laws of the organization to which they should properly belong." "Section 3. Any organization that is not represented in this council shall not be protected on any building or job until affiliated with this body except by unanimous consent of the council." Article IX establishes "an executive board, composed of the properly elected business agents of the various organizations affiliated with this council." By section 5 of the same article, "the executive board shall be empowered to act on all occasions on behalf of the council and to deal with all emergencies that may arise in the interim between meetings." Article XIII, sec-

tion 2, provides : " When any trouble occurs on any building or
job affecting any organization represented in this council, it
shall be the duty of the business agent of said organization to
immediately endeavor to settle same with the contractor or
owner in accordance with the trade rules and to the satisfaction
of the organization involved. Failing in this the business
agent shall have power to call said strike. If the aforesaid
strike is liable to become general, he shall then lay the matter
before the executive board at its next meeting and be governed
by their action or decision, which shall be equally binding on
all organizations in this council engaged on the job or build-
ing." Section 2 of article XI, as amended, provides : " The
funds for the maintenance and expenses of this council shall
be raised from the revenue obtained by issuing quarterly work-
ing cards at ten cents per card."

Four of the defendants are officers of the Allied Trades : Dan-
iel S. Wood is president ; M. Collins is vice-president ; Robert T.
Mitchell is secretary ; Thomas Maguire is treasurer. The re-
maining defendants, John Love and Harry Keeler are members
of the association, being delegates from two of its affiliated
trades unions.

2. The plaintiffs are also workmen. Their trade is that of
journeymen plumbers. They are members of an incorporated
trades union chartered by act of assembly of this commonwealth
under the corporate name of " The Plumbers' League of the
city of Philadelphia." The Plumbers' League is not now, and
has never been, in affiliation with the Allied Trades.

3. In the early part of the month of April, 1901, a large
building, known as the " Mariner and Merchant Building,"
was in course of erection at the southwest corner of Third
and Chestnut streets in the city of Philadelphia. The firm of
W. A. & A. E. Wells had the general contract for the erec-
tion of the building ; Hoban & Doyle, master plumbers and
gasfitters, were subcontractors for the plumbing and gasfitting.
The plaintiffs were employed by Hoban & Doyle as journey-
men and were at that time actually at work upon the plumbing
and gasfitting at the building. Their work was entirely satis-
factory to their employers and also to the general contractors.
None of the defendants were employed about the building.

4. In the early part of April, 1901, there were also at work

upon the Mariner and Merchant Building certain other mechanics, of the respective trades of electricians, painters and steamfitters' helpers, who were nonunion workmen and did not carry the quarterly card of the Allied Trades. The plaintiffs, who were the only plumbers at that time working at the building, were also without the quarterly card. At a meeting of the executive board of the Allied Trades, the date of which does not appear in evidence, a strike was ordered of the workmen engaged at the building in affiliation with the association, the reason assigned for which was the employment there of the nonunion electricians, painters, steamfitters, helpers, and the plumbers, the present plaintiffs; that is, of mechanics who did not carry the Allied Trades' working cards. The strike, according to the testimony, went into effect about two weeks prior to April 23, 1901, "on a Friday," and two thirds of the mechanics employed about the building ceased working there upon and after that day. The defendants, prior to this strike, had tried to induce plaintiffs to join with them, and plaintiffs had refused.

5. After the strike was in effect, the defendants, Mitchell, Love, Maguire and Keeler, representing the Allied Trades as a committee, called upon Mr. Gilbert, manager for the firm of general contractors engaged in erecting the building, and informed him that if the plaintiffs were removed from work at the building the strike would cease. There seem to have been several such interviews, as a result of which an agreement was finally reached, which was reduced to writing. This writing was placed in evidence at the trial, and is in the following words :

" Agreement entered into between the W. A. & A. E. Wells Company and the council of the Allied Building Trades.

" It is hereby agreed in the event of members of the United Association of Journeymen Plumbers finishing the plumbing in the Merchant and Mariner Building, on the corner of Third and Chestnut streets, and all workmen of other trades that are now or may hereafter be employed thereon, have in their possession the working card of their respective unions for the current quarter, that no other strike will be declared until the completion of the said building, provided, however, that a gen-

eral strike of any of the trades shall not be considered a viola-
tion of this agreement.

> "Executed this 16th day of April, 1901,
>> "By general contractor,
>>> "W. A. & A. E. WELLS.
> "THOMAS MAGUIRE, Chairman,                              [Seal]
> "R. T. MITCHELL, Secretary."

The United Association of Journeymen Plumbers, mentioned
in the agreement, is a trades union affiliated with the Allied
Trades.

In consequence of this agreement, Messrs. Wells & Wells
requested Hoban & Doyle to cause the plaintiffs to desist from
working at the said building, and Messrs. Hoban & Doyle
complied with that request, and on April 23, 1901, directed
the plaintiffs to cease working on the building. The plaintiffs
accordingly took away their tools on that day and have not
been employed at that building since. When they left the
building the strike was formally declared off; and the striking
workmen returned to their several employments. The steam-
fitters' helpers, painters and electricians, against whom the
strike had also been directed, were not required to leave the
building although they were still without working cards of the
Allied Trades; and, in point of fact, these mechanics continued
at work there after the strike was settled.

6. At the time or shortly after the removal of the plaintiffs
from the work upon the building, at Third and Chestnut
streets, Mr. Weild, president of the Plumbers' League, and
Mr. Clune, a member of the league, had an interview with the
defendant, Mitchell, secretary of the Allied Trades. The
president of the Plumbers' League asked of him whether "the
Allied Trades intended to stop meddling with the members of
the Plumbers' League and not interfere with them at their
work." He was informed by Mr. Mitchell that the Allied
Trades intended to pursue the same course as at Third and
Chestnut to drive every plumber in Philadelphia into the
United Association of Journeymen Plumbers; that they would
use the same means that they had used at Third and Chestnut
on every building where they had the opportunity of doing it;
that they intended to do the same as had been done with Erd-

mann, Best & Campbell "and the intentions were to drive all the plumbers of the city of Philadelphia into the U. A. Association."

7. Since April 23, 1901, the plaintiff, Best, has not been employed at his trade in the city of Philadelphia. He has, however, been working for Hoban & Doyle, his former employers, at out of town work. The plaintiff, Campbell, some weeks after April 23, 1901, went into the employ of another firm of master plumbers, and was set to work at a job in Philadelphia, where he remained for a few days. He has not had any other employment at his trade in Philadelphia. The plaintiff, Erdman, after April 23, 1901, lost nine days' work, then obtained a job for a few days in Oak Lane, which is in the city limits; since then he has not obtained any work at his trade in the city. He applied to several master plumbers for employment, but was everywhere refused work.

The court after discussing the law entered the following decree:

And now, November 26, 1901, this cause came on to be heard at this term and was argued by counsel, and upon consideration thereof it is ordered, adjudged and decreed as follows, viz: that the defendants and each and every of them, their committees, agents and servants be restrained and strictly enjoined from interfering and from combining, conspiring or attempting to interfere with the employment of the plaintiffs, or any one or more of them, by representing or causing to be represented, in express or implied terms, to any employer of said plaintiffs or any one or more of them, or to any person or persons or corporation who might become employers of any of the plaintiffs, that such employers will suffer or are likely to suffer loss or trouble in their business for employing or continuing to employ said plaintiffs or plaintiff; or by intimidating or attempting to intimidate by threats, direct or indirect, express or implied, of loss or trouble in business or otherwise, any person or persons or corporation who now are employing or may hereafter employ or desire to employ the plaintiffs, or any one or more of them; or by attempting by any scheme, combination or conspiracy among themselves or with others, to annoy, hinder or interfere with or prevent any person or persons or corporation from employing or continuing to em-

ploy said plaintiffs, or any one or more of them, and from any and all acts and from the use of any and all ways, means and methods, which (acts, ways, means and methods), by putting or attempting to put any person or persons or corporation in fear of loss or trouble, will tend to hinder, impede or obstruct the plaintiffs, or any one or more of them, from securing employment, or from continuing in employment; and that defendants pay the costs of this suit.

*Error assigned* was the decree of the court.

*Alexander Simpson, Jr.*, with him *Francis Shunk Brown*, for appellants.—Workmen have a right to go to all their friends, make known their wrongs, and say to them: "If you are a friend of labor, withdraw your patronage from the man who injures us or refuses us justice:" People v. Wilzig, 4 N. Y. Crim. Rep. 403 ; McCandless v. O'Brien, 8 Lanc. Law Rev. 254.

Organization is the privilege of labor ; and an organization seeking to promote "the mental, moral and physical welfare of its members" by securing fair wages, steady work and the comforts of home for them, occupies a legitimate field of usefulness, and is capable of doing great good to its members and to the public : Bradley v. Pierson, 148 Pa. 502; McVey v. Brendel, 144 Pa. 235; Sweeny v. Torrence, 1 Pa. Dist. Rep. 622 ; Murdock v. Walker, 152 Pa. 595 ; Cote v. Murphy, 159 Pa. 420 ; Wick China Co. v. Brown, 164 Pa. 449 ; Cook v. Dolan, 6 Pa. Dist. Rep. 524; O'Neil v. Behanna, 182 Pa. 236.

The free communication of thoughts and opinions is one of the inalienable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty : Marx, etc., Clothing Co. v. Watson, 168 Mo. 133 (67 S. W. Repr. 391).

Our own state has fixed its public policy, and by that the parties here are to be judged. No longer with us is the mere fact of combination a criminal offense. Members of a trades union may strike, and may notify other members to strike, and they cannot be held criminally or otherwise, unless they hinder others from working by force, threats or menaces : Com. ex rel. v. Sheriff, 15 Phila. 393; Act of May 8, 1869, P. L. 1260 ;

Act of June 14, 1872, P. L. 1175; Act of April 20, 1876, P. L. 45; Act of May 13, 1889, P. L. 194; Act of June 16, 1891, P. L. 300; Act of May 21, 1895, P. L. 95; Act of May 18, 1893, P. L. 102; Act of June 10, 1897, P. L. 139.

*David Lavis*, for appellees.—The violation of a contract is an unlawful act. Therefore, if one or more persons conspire with another to commit, or two or more persons combine together to effect such violation, and the object of the combination be consummated to the damage of a third person, such third person has his action to recover the damages against him who breached the contract, and every person who by reason of the combination is connected with the wrongs: Martens et al. v. Reilly et al., 84 N. W. Repr. 840; Flaccus v. Smith, 199 Pa. 128; Old Dominion S. S. Co. v. McKenna, 30 Fed. Repr. 48; Plant v. Woods, 176 Mass. 492 (57 N. E. Repr. 1011); O'Neil v. Behanna, 182 Pa. 236; Moran v. Dunphy, 177 Mass. 485 (59 N. E. Repr. 125); Walker v. Cronin, 107 Mass. 555.

OPINION BY MR. JUSTICE DEAN, October 12, 1903:

We have before us the somewhat unusual case of two warring trades unions invoking the law for the settlement of their respective rights and the determination of their legal conduct in carrying out the purpose of their respective organizations. From the facts found by the court below it appears that plaintiffs are journeymen plumbers, residents of Philadelphia, and members of an incorporated society chartered by act of assembly under the name of " The Plumbers' League of the City of Philadelphia." The defendants are members of an unincorporated association known as " The Council of Allied Building Trades of Philadelphia and Vicinity." This association is composed of delegates from different, separate and subordinate building trade unions in the city. Its theory of organization is, that there should be an affiliation of all trades unions throughout the city and the world, to the end that " competition shall be replaced by unity of action," and that workmen who make the profits of all industry possible should, as intelligent men, move and organize. The scope of their organization is indicated by this invitation: " We earnestly invite all organizations of workmen engaged in the building trades to join us in our perma-

nent efforts to build a permanent edifice until there shall be
no man in working trades that does not own allegiance to
the Council of the Allied Building Trades of the City of
Philadelphia." The Plumbers' League of Philadelphia, to
which plaintiffs belonged, did not accept this invitation; it
never became a member of the Allied Building Trades Council.

In April, 1901, a building was in course of erection at the
corner of Third and Chestnut streets, known as the " Mariner
and Merchant Building." The general contractors for it were
W. A. & E. A. Wells; under them as subcontractors for the
plumbing and gas fitting were Hoban & Doyle; the latter were
the employers of plaintiffs who were journeymen plumbers;
no one of defendants was employed on or about the building.
At the same time there were a number of other workmen em-
ployed on the building engaged in other trades, such as steam
fitters, painters, etc., who were nonunion men. While the
work was thus progressing the Council of the Allied Build-
ing Trades ordered a strike of all workmen engaged at the
building who were affiliated with the council. The reason
given for ordering the strike was, that workmen were em-
ployed on the building who were nonunion men, and plumbers
belonging to a society not affiliated with the Council of Allied
Trades. Previous to the strike, defendants had tried to induce
plaintiffs to join them, but plaintiffs had refused. Under the
strike order two thirds of the men then employed on the build-
ing quit work. While the strike was on, defendants called
upon the manager for the general contractors and told him,
that if plaintiffs were removed the strike would be called off;
the result was a writing, whereby it was agreed, that if plumb-
ers of the United Association of Journeymen Plumbers and
all other workmen on the building had in their possession the
working cards of their respective unions for the current quar-
ter, no other strike would be declared until the completion of
the building. This was signed by the general contractors and
the representatives of the Allied Building Trades. The mem-
bers of the United Association of Plumbers, authorized to
work, were members of an association affiliated with the
Council of the Allied Building Trades. The contractors car-
ried out their agreement and discharged the plaintiffs from
work on that building; then the strike was declared off.

Other workmen on the building, although nonunion men, were not discharged and continued work. About this time, representatives of the Plumbers' League, to which plaintiffs belonged, had an interview with Mitchell, one of the defendants, and secretary of the Council of the Allied Trades, and Mitchell informed them that the Allied Trades intended to pursue the same course in future, and to drive every plumber in Philadelphia into the United Association of Journeymen Plumbers, one of the Allied Trades. By this conduct of defendants, plaintiffs have been unable to secure any steady employment at their trade, and will have to enter one of defendants' unions or leave the city.

The court below was of opinion, that in so far as defendants, in furtherance of the purposes of the Council of the Allied Building Trades, undertook, by intimidation of plaintiffs and their employers to coerce the plaintiffs into joining their organization or any particular organization, and by such action caused the workmen to suffer damage, such action was unlawful and ought to be restrained by equity. This conclusion is correct. This is not an indictment for a statutory offense nor for a common-law conspiracy, which last the legislature by acts of 1872, 1876 and 1891 has practically abolished; it is a suit in equity to restrain an unlawful act. It is argued by appellees' counsel, that an act may be clearly unlawful although not the subject of criminal prosecution; that an agreement by a number of persons that they will by threats of a strike deprive a mechanic of the right to work for others merely because he does not choose to join a particular union, is a conspiracy to commit an unlawful act, which conspiracy may be restrained.

We do not question that defendants may, under their constitution and rules, resolve that they will not work with members of other organizations or with nonunion men and act accordingly; that is their right, and their organization, when the conduct of its members is limited to refraining from work themselves according to such resolution, is not unlawful. But it is manifest, from the findings of fact and the testimony, that defendants went far beyond this. The contractors undertook the erection of a large and expensive building; they employed a large number of men skilled in all branches of the building trades, a majority of whom were members of defendants'

union. No notice was given by the organization to the contractors that their members would not be permitted to work on the same building with members of plaintiffs' union or with nonunion men ; after the building had progressed until it had reached what may be called its critical stage, a strike was ordered of all the workmen affiliated with defendants' union and two thirds of all at work quit. After the strike, negotiations for calling it off were opened between the manager for the contractors and defendants, and the result was the agreement with their union heretofore noticed ; then followed the discharge of plaintiffs from work on that building and then an interview between the president of plaintiffs' union and the secretary of defendants' ; the latter told the president that the Allied Trades intended to pursue the same course as at the Mariner and Merchant Building on every building in the city, for the purpose of driving every plumber into a union affiliated with the Allied Trades. This evidence would have established a criminal conspiracy at common law; concede, that it would not, under our present legislation, now establish it, nevertheless it is still an unlawful act. There was no complaint as to wages by any of the workmen on the building when the strike was declared; all wanted to work and their employers wanted them to work. But these defendants who did not work on the building had a grievance ; plaintiffs refused to and would not join defendants' union ; they must be driven to joining it by threats of loss of work, and their employers must be compelled to aid defendants by threats of loss of money on their contract.

This is so plain that it is waste of time to more than state the facts to convince that the conduct of defendants was calculated to intimidate both employees and employers, and consequently was unlawful. The frightened employers, to avoid further loss yielded ; the plaintiffs did not yield, and to prevent further intimidation of those who would otherwise employ them, they seek by this suit to restrain defendants from future acts of intimidation.

The first article of the constitution says : " That the general great and essential principles of liberty and free government may be recognized and unalterably established; we declare, that all men are born equally free and independent

and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation and of pursuing their own happiness." Then follows the conclusion of this section: " Everything in this article is excepted out of the general powers of the government and shall forever remain inviolate." This clause, unlike many others in the constitution, needs no affirmative legislation, civil or criminal, for its enforcement in the civil courts. Wherever a court of common pleas can be reached by the citizen, these great and essential principles of free government must be recognized and vindicated by that court, and the indefeasible right of liberty and the right to acquire property must be protected under the common-law judicial power of the court. Nor does it need statutory authority to frame its decrees or statutory process to enforce them against the violators of constitutional rights.

The right to the free use of his hands is the workman's property as much as the rich man's right to the undisturbed income from his factory, houses and lands ; by his work he earns present subsistence for himself and family ; his savings may result in accumulations which will make him as rich in houses and lands as his employer. This right of acquiring property is an inherent indefeasible right of the workman ; to exercise it he must have the unrestricted privilege of working for such employer as he chooses at such wages as he chooses to accept. This is one of the rights guaranteed him by our " Declaration of Rights ; " it is a right of which the legislature cannot deprive him, one which the law of no trades union can take from him, and one which it is the bounden duty of the courts to protect. The one most concerned in jealously maintaining this freedom is the workman himself.

A conspiracy is the combination of two or more persons by some concerted action to accomplish an unlawful purpose. It is unlawful to deprive a mechanic or workmen of work by force, threats or intimidation of any kind ; a combination of two or more to do the same thing by the same means is a conspiracy. That by the legislation referred to such conspiracy is no longer criminal, does not render it lawful. At common law the courts held that such combination was so prejudicial to the public in-

terests and so opposed to public policy as rendered it punishable criminally; but the legislature, which generally determines· what is and what is not public policy, has declared, that it is no longer a crime or misdemeanor    But this is as far as it has gone, it is as far as it could go without abolishing the Declaration of Rights; to do that the whole people of the commonwealth must be directly consulted and they must give assent.    For while the plain implication from the declaration is that the power to limit this indefeasible right rests solely with the people, yet when they adopted the constitution of 1874, with an extreme of caution they expressly said, " Everything in this article is excepted out of the general powers of government and shall forever remain inviolate." That is, shall forever remain with the people; they will not trust their own legislature with power to minimize or fritter it away, much less a trades union. If the legislature to-day abolished indictment for wilful and malicious trespass, or abolished the writ of estrepement, to-morrow courts of equity would still be bound under the Declaration of Rights to protect the citizen in the peaceable possession and enjoyment of his land, even if to do so they were compelled to imprison the lawless trespasser who refused to obey their writs.  So the same courts are still bound to protect the humblest mechanic or laborer in his right to acquire property.

Trades unions may cease to work for reasons satisfactory to their members, but if they combine to prevent others from obtaining work by threats of a strike or combine to prevent an employer from employing others by threats of a strike, they combine to accomplish an unlawful purpose, a purpose as unlawful now as it ever was, though not punishable by indictment.  Such combination is a despotic and tyrannical violation of the indefeasible right of labor to acquire property which courts are bound to restrain.  It is utterly subversive of the letter and spirit of the Declaration of Rights.  If such combination be in accord with the law of the trades union, then that law and the organic law of the people of a free commonwealth cannot stand together; one or the other must go down.

It is argued, defendants, either individually or by organization, have the right, now, to peaceably persuade plaintiffs and others not to work and their employer not to hire them;

so they have.  It is further argued that they can quit work when they choose; so they can.  But neither of these suggested cases is the one before us.

Here a strike on a large building was declared because plaintiffs would not join a particular society; the declared purpose of the strike was to cause loss of employment to plaintiffs because they would not join the Allied Building Trades, chose to remain faithful to their own union the Plumbers' League; the Allied Trades would not declare the strike off, and permit work on the buildings to proceed until the employers entered into contract, practically stipulating that they would discharge plaintiffs and not reemploy them.  It is not important that apt language precisely expressing the threat should have been used; the meaning of their declarations and acts was well understood by all parties.  The men lost their work; the employers after a damaging stoppage were permitted to proceed because they yielded to the threat, that is, they were intimidated because they feared further loss.  How absurd it is to call this peaceable persuasion, and how absurd to argue that if the law attempts to prevent it the right of the workmen to organize for their common benefit is frustrated.  And then, what about the right of the Plumbers' League to organize for the common benefit of its members of whom the plaintiffs are a part?  The declared purpose of the Allied Trades is by these acts to absorb this union and thereby destroy it.  Under no possible view of the conduct of defendants was it lawful.  The opinion of the Superior Court of Massachusetts, Plant *v.* Woods, 176 Mass. 492,* on a case much like this, expresses the manifest deduction from these facts:

" The manifest object of the defendants was to have all the members of the craft subjected to the rules and discipline of their particular union in order that they might have better control over the whole business, and to that end they combined and conspired to get the plaintiffs and each of them to join the defendant association, peaceably if possible, but by threat and intimidation if necessary. . . . The right involved is the right to dispose of one's labor with full freedom.  This is a legal right and is entitled to legal protection. . . . The purpose of these defendants was to force the plaintiffs to join the defend-

* Also reported 57 N. E. Repr. 1011.—Reporter.

ant association, and to that end they injured the plaintiffs in their business and molested and disturbed them in their efforts to work at their trade. It is true they committed no acts of personal violence or physical injury to property, although they threatened to do something which might reasonably be expected to lead to such results. In their threat however, there was plainly that which was coercive in its effort upon the will. It is not necessary that the liberty of the body should be restrained. Restraint of the mind, provided it would be such as would force a man against his will to grant the thing demanded, and actually has that effect, is sufficient in cases like these."

In that case the injunction was awarded as it was here: 1 Eddy on Combinations, 416 says:

" The courts recognize the right of workingmen to combine together for the purpose of bettering their condition, and in endeavoring to attain their object they may inflict more or less inconvenience and damages upon the employer; but a threat to strike unless their wages are advanced is something very different from a threat to strike unless workmen who are not members of the combination are discharged. In either case the inconvenience and damage inflicted upon the employer is the same ; but in the one case the means used are to obtain a legitimate purpose, namely, the advancement of their own wages, and the injury inflicted is no more than is lawfully incidental to the enjoyment of their own legal rights. In the other case the object sought is the injury of a third party; and while it may be argued that indirectly the discharge of the nonunion employee will strengthen and benefit the union and thereby indirectly benefit the union workmen, the benefit to the members of the combination is so remote, as compared to the direct and immediate injury inflicted upon the nonunion workmen, that the law does not look beyond the immediate loss and damage to the innocent parties to the remote benefits  that might result to the union."

And so, as already intimated, it comes simply to the question, shall the law of an irresponsible trades union, or, shall the organic law of a free commonwealth prevail? We answer every court of the commonwealth is bound to maintain the latter in letter and spirit.

The learned judge of the court below has so framed his decree

that it is directed only against the unlawful acts. If there be disobedience or evasion of it, he thoroughly understands how to enforce it.

All the assignments of error are overruled and the decree is affirmed at costs of appellants.