# Purvis *v.* Local No. 500, United Brotherhood of Carpenters and Joiners et al., Appellants.

*Master and servant—Strikes—Coercion—Protection of property—Labor unions.*

An employer of workmen has a right to invoke, for the protection of his property, the bill of rights, against a labor union which seeks to coerce him in such a way that he would be compelled to employ only union workmen, to submit himself to the control of the union, and to put himself within its power to dictate to him the number of hours to constitute a day's work in his mill, the compensation to be paid therefor, the time of payment thereof, and the selection of his employees. The coercive acts which the courts will enjoin may be without threats or commission of violence or

personal injury. Declarations by officers of the union that they intended to drive the employer out of business unless he unionized his mill, followed by notices to customers of the employer not to use the latter's material under threats of strikes in the customers' own establishments, are such coercion as will be enjoined by the courts, and there is nothing in the Act of June 16, 1891, P. L. 300, which sanctions it.

Argued Oct. 19, 1905. Appeal, No. 52, Oct. T., 1905, by defendants, from decree of C. P. Butler Co., March T., 1904, No. 1, on bill in equity in case of J. L. Purvis and L. O. Purvis, trading as S. G. Purvis & Company, v. L. C. Wick, Local No. 500, United Brotherhood of Carpenters and Joiners of America et al. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity for an injunction. Before GALBREATH, P. J. The facts are stated in the opinion of the Supreme Court.

The court entered the following decree:

That the defendants (not including L. C. Wick) and each and every of them, their officers, committees, agents, employees, servants, members, associates, and all others that may act in concert with them, or by their direction, each and every one, be restrained and strictly enjoined from interfering and from combining, conspiring or attempting to interfere, for the purpose of doing injury to plaintiffs in their business, with the sale or contract for sale by the plaintiffs of building materials by representing or causing to be represented in express or implied terms to any customer of the plaintiffs, or to any person or persons or corporation who might become customers of the plaintiffs, that such customers will suffer or are likely to suffer loss or trouble in their business for purchasing or continuing to purchase or contracting for the purchase of building materials from the plaintiffs; or by intimidating or attempting to intimidate by threats, direct or indirect, express or implied, of loss or trouble in business, or otherwise, any persons or corporation who are now customers or who may hereafter become or desire to become customers of the plaintiffs; or from sending out to any person or persons or corporation who are now customers, or who may hereafter become or desire to become customers of the plaintiffs, through the mails, or delivering to them otherwise,

any written or printed card, letter, circular or other notice, stating that members of the United Brotherhood of Carpenters and Joiners will not handle or work mill work or materials coming from mills which fail to comply with regulations of the Carpenters' District Council and that the plaintiffs had failed to comply with an agreement of the planing mill association of Western Pennsylvania with the Carpenters District Council, or an agreement adopted by the Master Builders' Association and said Council, and requesting such customers or prospective customers of the plaintiffs to have their mill work done by mills that operate under said agreement so that no controversy can arise on account of nonunion mill work, or from sending out to such customers or prospective customers of the plaintiffs any card, circular or other notice of similar character or purpose, directly or indirectly, or from writing or sending through the mails or otherwise, any written or printed card, circular, letter or other communication, conveying or intending to convey, to any customers or prospective customers of the plaintiffs that the plaintiffs are under the ban of Local No. 500, United Brotherhood of Carpenters and Joiners of America, or the Carpenters' District Council of Pittsburg, Allegheny and vicinity, United Brotherhood of Carpenters and Joiners of America, or other trades union, or of similar import; or from attempting by any scheme, combination or conspiracy among themselves or with others, to annoy, hinder or interfere with or prevent any person or persons or corporation from purchasing building materials, or making contracts for the purchase of the same, from the plaintiffs, and from any and all acts, and from the use of any and all ways, means and methods with a purpose to injure plaintiffs in their business, which (acts, ways, means and methods) by putting or attempting to put any person or persons or corporation in fear of loss or trouble will tend to hinder, impede or obstruct the plaintiffs from making sale, or making contracts for sale, of building materials; or from interfering and from combining, conspiring, or attempting to interfere, for said purpose, with the business of the plaintiffs, by the enforcement, under pain of penalties and forfeitures, of rule 7 of the working rules adopted for the government of local unions under the jurisdiction of the Carpenters' District Council of Pittsburg, Allegheny and vicinity, United Brotherhood of Carpenters and

Joiners of America, which provides that, " No member shall be allowed to work any material coming from any non-union mill and shall comply with this rule when the local unions are so informed and instructed by the district council," or by other like coercive rules, the natural and necessary effect of which would be to deter the members of said trades unions or others from working upon buildings or other constructions to which the plaintiffs were furnishing materials, or contractors, builders or owners of said buildings or other constructions, or others, from purchasing materials from the plaintiffs; or from interfering and from combining, conspiring, or attempting to interfere with the business of the plaintiffs for the purpose of injuring them in their business, by the enforcement of fines or forfeitures, suspension or expulsion from membership in any of the locals within the jurisdiction of the Carpenters' District Council of Pittsburg, Allegheny and vicinity, United Brotherhood of Carpenters and Joiners of America, for failure to observe rule 7, of the working rules adopted for the government of local unions under the jurisdiction of said Carpenters' District council of Pittsburg, Allegheny and vicinity, United Brotherhood of Carpenters and Joiners of America, or for failure to observe any of the rules adopted and in force in that union, or that may hereafter be adopted, which would by coercion of said members interfere with the business of the plaintiffs, or from otherwise restraining, coercing and intimidating any one or more of the members of said union for said purpose from working for any contractors, builders, owners or other persons because they are doing or desire to do business with the plaintiffs; or from interfering and from combining, conspiring or attempting to interfere with the business of the plaintiffs by the issue of union labels to any mill within the jurisdiction of the Carpenters' District Council of Pittsburg, Allegheny and vicinity, United Brotherhood of Carpenters and Joiners of America, such issue of labels being made for the purpose of interfering with the business of the plaintiffs.    From the doing of any and all of which acts and things, for the purpose of injuring plaintiffs in their business and thereby compelling them to unionize their mill or have such injury continued, the said defendants (not including L. C. Wick) and each and every of them, their officers, committees, agents, employees, servants,

members, associates and all others that may act in concert with them, or by their direction, are hereby enjoined and restrained.

The decree further assessed $1,770 damages against the defendants, and in favor of the plaintiffs.

*Error assigned* among others was the decree of the court.

*Lev McQuistion,* with him *W. J. Brennen,* for appellant.— The evidence did not show coercion: Bohn Mfg. Co. v. Hollis, 54 Minn. 223 (55 N. W. Repr. 1119); McCandless v. O'Brien, 8 Lanc. Law Rev. 254; People v. Wilzig, 4 N. Y. Crim. 403; Erdman v. Mitchell, 207 Pa. 79; Wood v. Bowron, L. R. 2 Q. B. 25; Macauley v. Tierney, 19 R. I. 255 (33 Atl. Repr. 1); Bowen v. Matheson, 96 Mass. 499.

*T. C. Campbell,* with him *W. B. Purvis,* for appellees.—The acts of the defendants shown in this case were unlawful, and complainants were rightfully entitled to the injunction granted by the court below to restrain their repetition. They were a conspiracy to boycott and an attack upon complainants' constitutional rights of acquiring, possessing and protecting property, and of pursuing their own happiness. They were without lawful excuse and injurious to complainants, and therefore were malicious in law, and they were coercive: Toledo, etc., Ry. Co. v. Penna. Co., 54 Fed. Repr. 730; Gray v. Building Trades Council, 91 Minn. 171 (97 N. W. Repr. 663); Brace v. Evans, 5 Pa. C. C. Rep. 163; Curran v. Galen, 152 N. Y. 33 (46 N. E. Repr. 297); Delz v. Winfree, 80 Texas, 400 (16 S. W. Repr. 111); Boutwell v. Marr, 71 Vt. 1 (42 Atl. Repr. 607); Ertz v. Produce Exchange, 79 Minn. 140 (81 N. W. Repr. 737); Old Dominion Steamship Co. v. McKenna, 30 Fed. Repr. 48; Lucke v. Clothing Cutters', etc., Assembly, 77 Md. 396 (26 Atl. Repr. 505); Doremus v. Hennessy, 176 Ill. 608 (52 N. E. Repr. 924); Gatzow v. Buening, 106 Wis. 1 (81 N. W. Repr. 1003); Hawarden v. Coal Co., 111 Wis. 545 (87 N. W. Repr. 472); State v. Donaldson, 32 N. J. L. 151; Crump v. Com., 84 Va. 927 (6 S. E. Repr. 620); State v. Glidden, 55 Conn. 46 (8 Atl. Repr. 890); State v. Stewart, 59 Vt. 273 (9 Atl. Repr. 559); Casey v. Cincinnati Typographical Union, 45 Fed. Repr. 135; Bohn Mfg. Co. v. Hollis, 54 Minn. 223 (55

N. W. Repr. 1119) ; Sherry v. Perkins, 147 Mass. 212 ( 17 N. E. Repr. 307) ; Jackson v. Stanfield, 137 Ind. 592 (36 N. E. Repr. 345) ; Plant v. Woods, 176 Mass. 492 (57 N. E. Repr. 1011) ; Vegelahn v. Guntner, 167 Mass. 92 (44 N. E. Repr. 1077) ; Macauley v. Tierney, 19 R. I. 255 (33 Atl. Repr. 1)'; National Protective Assn. v. Cumming, 170 N. Y. 315 (63 N. E. Repr. 369) ; Longshore Printing Co. v. Howell, 26 Oregon 527 (38 Pac. Repr. 547) ; Brown v. Jacobs' Pharmacy Co., 115 Ga. 429 (41 S. E. Repr. 553) ; Oxley Stove Co. v. Coopers' International Union, 72 Fed. Repr. 695 ; Barr v. Essex Trades Council, 53 N. J. Eq. 101 (30 Atl. Repr. 881) ; Jersey City Printing Co. v. Cassidy, 53 Atl. Repr. 230 ; Martin v. McFall, 55 Atl. Repr. 465 ; Hopkins v. Oxley Stave Co., 83 Fed. Repr. 912 ; Erdman v. Mitchell, 207 Pa. 79 ; Employing Printers' Club v. Blosser Co., 50 S. E. Repr. 353 ; State v. Stewart, 59 Vt. 273 (9 Atl. Repr. 559) ; Johnston Havester Co. v. Meinhardt, 60 Howard, 168.

*Lev McQuistion,* with him *W. J. Brennen,* for appellants, in reply.—The defendants' acts and conduct are clearly within the law in all they did: Biever v. Herr, 1 Pearson, 510 ; Macauley v. Tierney, 19 R. I. 255 (33 Atl. Repr. 1) ; McVey v. Brendel, 144 Pa. 235 ; Bradley v. Pierson, 148 Pa. 502 ; Wick China Co. v. Brown, 164 Pa. 449 ; O'Neil v. Behanna, 182 Pa. 236 ; Thomas v. Ry. Co., 62 Fed. Repr. 803 ; Wood v. Bowron, L. R. 2 Q. B. 25 ; Toledo, etc., Ry. Co. v. Penna. Co., 54 Fed. Repr. 730 ; Arthur v. Oakes, 63 Fed. Repr. 310.

OPINION BY MR. JUSTICE BROWN, March 19, 1906 :

The zeal of counsel may account for, but can hardly excuse, the statement in appellants' paper-book of the questions involved on this appeal. They are there stated to be : " Is the dissemination by means of printed notices by a lawfully constituted lodge of union laborers to its members and employers of labor, of its adopted rules by virtue of its constitution forbidding its members to work non-union material, an unlawful conspiracy ? Is it lawful by peaceful means to make effective such rules ? " From an examination of the averments of plaintiffs' bill, the ample proofs submitted in support of them, and of the facts found by the court below, it is

most manifest that the only question before us is, whether the appellants were properly enjoined from injuring and destroying the business of the appellees, in pursuance of a conspiracy to do so, as a penalty for their refusal to unionize their mill. This would mean to the appellees, as they aver, that they would be compelled to employ only union workmen and to yield their free and unrestricted right to select their own employees in the conduct of their business ; that they would be compelled to submit themselves to the control of the union, and to put themselves within its power to dictate to them the number of hours to constitute a day's work in their mill, the compensation to be paid therefor, the time of payment thereof and the selection of their employees. It would be a recognition of the power of the agents of the union to practically control their business.

The opinion of the court below is learned and exhaustive, and upon it the decree might well be affirmed. The briefs on each side are most elaborate ; but, after all, the question involved is a very simple one and calls for no lengthy discussion by us. The rights of mechanics and laborers, and of labor organizations and unions, as recognized in innumerable cases, are not affected by the decree, and need not, therefore, be considered here. The question is the unlawfulness of the conspiracy of the appellants to injure and destroy the property of others, if their demands as to the employment of workmen are not complied with. The question is not as to the unlawfulness of the demands which they make, but is as to their conduct upon learning that these demands are ignored by the appellees. The demands in themselves can do no harm to the latter ; it results from the means employed to coerce compliance with them. The appellants contend that they seek only to persuade, and not to coerce ; but their means of persuasion are the destruction of the property of those whom they would persuade. As well might it be said that the sight of the club or gun of the highwayman without actual violence simply persuades. No violence was used by the appellants, and it does not appear that any was contemplated or threatened ; but coercion may be accomplished without threats or violence and the attempt to so accomplish it was made in this case. Putting one in actual fear of loss of his property or of injury to his business,

unless he submits to demands made upon him, is often no less potent in coercing than fear of violence to his person. " Restraint of the mind, provided it would be such as would be likely to force a man against his will to grant the thing demanded, and actually has that effect, is sufficient in cases like this : " Plant v. Woods, 176 Mass. 492. Of the conduct of the appellants the words of our late Brother DEAN, in Erdman v. Mitchell, 207 Pa. 79, may well be repeated : " How absurd is it to call this peaceable persuasion, and how absurd to argue that if the law attempts to prevent it the right of the workmen to organize for their common benefit is frustrated."

After reciting the material facts found, the court below thus summarizes the situation : " These things all point to a combined purpose on part of Local No. 500 and the District Council to compel plaintiffs to unionize their mill by working injury to their business. To accomplish this the whole power of the union was brought to bear upon them, both in the Pittsburg district and the home community. The members of Local No. 500 who were found working material from their mill were coerced by the compelling power of the union to quit work on pain of trial, fine or expulsion, with its attendant annoyance and possible ostracism, in case of their refusal. By the same power owners, former customers and contractors were coerced through the urgency of their circumstances to withhold their patronage, while through the conditions thus created the public was deterred, as the evidence indicates, from placing orders with plaintiffs, which would otherwise have gone to them. Along these converging ways the whole power of the union was brought to bear upon the plaintiffs to coerce them into submission. If any doubt remained as to the correctness of this inference, drawn from the acts of the defendants, it is removed by the expressed purpose of their official agent. Joseph L. Purvis, one of the plaintiffs, testifies, that in the latter part of January last, Mr. Lewis, a business agent of the District Council, came, with others, to plaintiffs' place of business to urge upon them that they unionize their mill. The matter was considered at length, and reasons were given by Mr. Purvis why it was not practicable for them to do so. Mr. Purvis says, ' I explained all this to Mr. Lewis and tried to show him ; the only alternative he showed us to joining the

union was for us to quit business as a manufacturing business; —that was the only alternative left, which we declined; then they intimated inasmuch as we declined to do that we would have to stop estimating in Pittsburg; to that I replied I would prefer to stop unless we could estimate in Pittsburg and could see a reasonable profit.' Again Mr. Purvis testifies, ' Mr. Lewis and Mr. Dougherty were there together, they were there together most of the time. Mr. Dougherty was there all the time. Mr. Lewis went away and would come back again, and a great deal of this conversation they were both present and joined in; it may not have been Mr. Lewis, it may have been Mr. Dougherty, but between them we were given to understand that unless we unionized our mill we would be obliged to quit business.' L. O. Purvis, also a member of plaintiffs' firm, testifying to the same interview with Mr. Lewis, says: ' He undertook to argue that it would be better for our mill to be a union mill inasmuch as there was going to be trouble if it was not unionized.' W. E. Cochran, a building contractor, and a witness on part of plaintiff, testifies that in January last he had a conversation with Mr. Lewis and Mr. Swartz, another business agent of the District Council, also a defendant in this case, in which conversation Mr. Lewis stated to him ' that they had come to Butler prepared to drive Purvis & Company into the union; that they had at that time sufficient leverage to enable them to see that it was done.' It is worthy of notice that at this time the plaintiffs had a contract with Mr. Kreusler, a building contractor of Pittsburg, to furnish material amounting in price to about $20,000, for a large building then being constructed by him in the city of Pittsburg. Great pressure at that time seems to have been brought to bear on both Mr. Kreusler and the plaintiffs, through the medium of this contract, to compel the unionizing of plaintiffs' mill. The union men, employed by Kreusler to put the work together before removing it from plaintiffs' warehouse in Butler, were called off at a time when the material was urgently needed by the contractor to complete his contract, and when, according to the testimony, about $10,000 worth of the material was still in plaintiffs' hands. It was during this period of urgency that the conversations and declarations above referred to were had and made. These declarations as well as the acts of the de-

fendants leave no reasonable doubt that the purpose of defendants was to compel plaintiffs to unionize their mill or otherwise suffer irreparable injury to their business, and that they were acting in concert to effect that purpose."

We shall not quote the specific findings, but attention ought to be directed to one of them : " The Central Hotel in Butler had been partially destroyed by fire, and was being repaired, under the supervision of Ed. Weigand, a building contractor, who, under instructions from Mr. Nixon, the owner, was ordering the material as needed from the plaintiffs. The work was urgent, as the owner was anxious to utilize the building. The union men at work on the building were called off and were not permitted to resume work until Mr. Nixon entered into a written agreement with the business agent, Goerman, business agent of Local No. 500, bearing date, January 9, 1904 ; ' that no material delivered after January 8, 1904, coming from S. G. Purvis & Co. shall be used on the Central Hotel until said mill is operated according to union rules.' "

The right of a workman to freely use his hands and to use them for just whom he pleases, upon just such terms as he pleases, is his property, and so in no less degree is a man's business in which he has invested his capital. The right of each—employer and employee—is an absolute one, inherent and indefeasible, of which neither can be deprived, not even by the legislature itself. The protection of it, though as old as the common law, has been reguaranteed in our bill of rights. " All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness : " Const. Art. I, sec. 1. " The principle upon which the cases, English and American, proceed, is, that every man has the right to employ his talents, industry and capital as he pleases, free from the dictation of others ; and if two or more persons combine to coerce his choice in this behalf, it is a criminal conspiracy. The labor and skill of the workman, be it of high or low degree, the plant of the manufacturer, the equipment of the farmer, the investments of commerce are all, in equal sense, property : " State v. Stewart, 59 Vt. 273. A person's business is property, entitled under

the constitution to protection from unlawful interference. Every person has a right, as between his fellow citizens and himself, to carry on his business, within legal limits, according to his own discretion and choice, with any means which are safe and healthful, and to employ therein such persons as he may select: Barr v. Essex Trades Council, 53 N. J. Equity, 101. With the absolute right of the appellees in their property, the appellants assumed to interfere, and would injure, if not destroy, it, if their demands are not complied with. This no court will tolerate.

As already stated, of the demands in themselves the appellees could not be heard to complain. The appellants contend that they are made for the benefit of the members of their union. This is undoubtedly so, and, if the injury resulting from a disregard of them is confined to its members, they alone can complain; and even if injury incidentally results to outsiders, through compliance by the members of the union with its rules and orders, there may be no remedy for it. An agreement by those to be benefited by it, that they will themselves observe its terms in accepting employment, even if employers be incidentally embarrassed thereby, can occasion no injury to employers which the law will recognize, for workmen, whether bound by a compact among themselves or not, have the absolute right to give their services to whom they please, or to withhold them from whom they please, without responsibility for consequences to employers or to anyone else. But this is not the case when the primary purpose is to unlawfully coerce others that, as a result of the coercion, benefits may accrue to those who coerce. The attempt to coerce by unlawful means, by conspiring to injure and destroy property, is in itself an unlawful act, no matter what end is to be accomplished, and the concern of the law is only for the protection of those who are to be wronged. Benefits which it is alleged will result to the wrongdoers cannot be considered without sanctioning the wrong, without justifying unlawful means for the accomplishment of an end. By no specious reasoning can the conduct of the appellants be construed into anything else than a conspiracy to perpetrate wrong for the accomplishment of beneficial results to themselves. In this connection we adopt as expressive of our views and rendering

any further comment unnecessary the following from the well considered opinion of the learned judge below :

"The business of the plaintiffs is property within the meaning of the law. The defendants sought, by concerted action, to injure them in their business, in other words, their property, in order to coerce them into submission to the demands of the union. Compliance with these demands meant that the plaintiffs, who furnish the capital, were not to be dominant in the control of their business, but that both they and their business were to be controlled, in most of its essential features, by others who were in no way responsible for the capital invested or the losses that might be entailed. The purpose of defendants to effect this by injury to and, if need be, by the destruction of plaintiffs' business was an unlawful purpose and the combination of defendants to accomplish that purpose was an unlawful combination and therefore in law a conspiracy. True, the defendants contend and testify that their purpose was to benefit their own members. This, doubtless, in a sense, is true, but the benefits sought were the remote purpose, which was to be secured through the more immediate purpose of coercing the plaintiffs into complying with their demands, or otherwise injuring them in their business, and the court cannot, in this proceeding, look beyond the immediate injury to the remote results. Such is the doctrine laid down in Eddy on Combinations and quoted with approval in the case of Erdman v. Mitchell, supra, as follows : 'The benefit to the members of the combination is so remote, as compared to the direct and immediate injury inflicted upon the non-union workmen' (in this case the non-union mill owners) 'that the law does not look beyond the immediate loss and damage to the innocent parties to the remote benefits that might result to the union.'

"In the case of Plant v. Woods, 176 Mass. 492, the court says : 'The necessity that the plaintiffs (members of one union) should join this association (defendants' union) is not so great nor is its relation to the rights of the defendants, as compared with the rights of the plaintiff to be free from molestation, such as to bring the acts of the defendants under the shelter of the principles of trade competition. Such acts are without justification and therefore are malicious and unlawful,

and the conspiracy thus to force the plaintiffs was unlawful. Such conduct is intolerable and is inconsistent with the spirit of our law.'

"In the case of Curren v. Galen, 152 N. Y. 33, it is said, 'The social principle which justifies such organization is departed from when they are so extended in their operation as either to intend or to accomplish injury to others.'

"It is unnecessary to multiply authorities to establish the unlawfulness of defendants' purpose as expressed by their agents and indicated by their acts. In reaching this conclusion I do not ignore but gladly recognize the right of workmen and others to combine for the worthy purpose of bettering their condition. In their efforts to attain this end they may inflict more or less inconvenience and damage on others. But these results should be incidental damage and inconvenience consequent on the operation of general rules, lawful in themselves, rather than those which follow a specific intent and immediate purpose of injury to others in order that good may ultimately come to themselves.

"The doctrine that the end sanctifies the means has no place in a condition of society where law prevails. Even a good purpose must abide its time and follow the path marked out by law rather than hasten its accomplishment by ignoring the equal rights of others. A patient recognition of these safeguards which the law has thrown about every lawful possession, and of those limitations and restraints within which every lawful endeavor must be advanced, is the only sure way of helping on any worthy cause.

"Turning from a consideration of the nature of the purpose of defendants, as indicated by their words and deeds, I desire to briefly consider the means used to effect that purpose. On part of plaintiffs it is alleged that the means used are a boycott of their business. The defendants contend that their methods were persuasive and were not accompanied with violence, threats or intimidation.

"No violence was used nor does any seem to have been contemplated or threatened. But acts may be coercive in character without threats or commission of violence or personal injury. When the District Council with its seven thousand members in the Pittsburg district gave notice to practically all the build-

ing contractors of that district that the plaintiffs refused to run their mill in accordance with union rules, and calling attention to the working rule which forbids union workmen to work material from any non-union mill, the contractors understood what the request not to patronize plaintiffs' mill meant. When the members of Local No. 500, who were willingly working material from plaintiffs' mill, were visited by the business agent of the union, who called them off, they doubtless knew that it meant trial, fine or expulsion and ostracism if they continued to work. When the owner of the Central Hotel was required in the urgency of his situation, to sign a contract with the business agent of the union not to purchase any more material from plaintiffs as the condition of having work continued on his building, it can scarcely be said that his freedom of action was not interfered with; when the business agents of the District Council declared that they had come to Butler prepared to drive Purvis & Company into the union, when they stated to plaintiffs there was going to be trouble if the mill was not unionized, and gave them to understand that they must unionize their mill or quit business, all parties well understood what that meant. In all these things the attitude of the defendants was threatening and coercive rather than persuasive."

In attempting to justify their conduct the appellants allege authority for it in the Act of June 16, 1891, P. L. 300. While that act provides that they may devise and adopt ways and means to make rules, regulations, by-laws and resolutions of their order effective, it sanctions no rules, regulations, by-laws or resolutions to commit wrong, and if it attempted to do so by authorizing the appellants to interfere with the absolute rights of the appellees, the legislation would be a dead letter, for the legislature cannot abolish the declaration of rights; to do that the whole people of the commonwealth must be directly consulted and they must give assent: Erdman v. Mitchell, supra.

In assessing the damages sustained by the plaintiffs and directing their payment no error was committed by the court. All of the assignments are dismissed and the decree is affirmed at the costs of the appellants.