# AMERICAN FEDERATION OF LABOR v. BUCK'S STOVE & RANGE COMPANY.*

CONSPIRACY; COMBINATIONS IN RESTRAINT OF TRADE; INJUNCTION; BOYCOTT.

1. Where a labor federation composed of local unions throughout the country, having a membership of nearly two million wage earners, and which publicly asserts the legality of the boycott, and advocates its use as a means for the redress of wrongs to workmen, indorses the action of one of the local unions, the members of which were employees of a stove manufacturing company, in declaring a strike against their employer and a boycott against its product; publishes such employer's name in its official organ in its "We Don't Patronize" list, which is, in effect, a notice to workmen that a boycott is to follow, and thereafter dealers in the company's stoves are notified of the boycott by leaders of unions all over the country, and that they must cease dealing in the company's product or they will themselves be boycotted, and in one instance a boycott is declared against a dealer who refuses to discontinue selling the stoves; and, after the filing of a bill in equity by the company against the federation and its officers, its executive counsel officially reaffirms the indorsement of the action of the local union,—there is sufficient evidence connecting the federation and its officers with the boycott to justify the court in granting an injunction *pendente lite* against them from further prosecuting the boycott.

2. Where the immediate purpose and result of a combination among labor unions is to interfere with the lawful business of a manufacturer, and to deprive him and his customers of their right of trade intercourse, it is unlawful, whether the remote object of the combination is to benefit members of one of the local unions who are being employed by the manufacturer, or whether physical coercion is employed in carrying out the purpose of the combination.

---

*Boycott.* — The cases dealing with the right of labor union to notify persons not to deal with a certain individual are gathered in a note to *Hey* v. *Wilson*, 16 L.R.A.(N.S.) 85; see also note to *Lindsay & Co.* v. *Montana Federation of Labor*, 18 L.R.A.(N.S.) 707.

*Conspiracy.*—As to the right of labor union to forbid its members to handle one's product, see note to *Purvis* v. *Local No. 500, U. B. C. & J.* 12 L.R.A.(N.S.) 643.

3. While an individual has the right to trade with whom he will, it does not follow that a combination of individuals have the right to discontinue, or threaten to discontinue, business intercourse with a given dealer and all who handle his product. Such a combination deflects the natural course of trade, and it is the combination or conspiracy, and not natural causes, that is responsible for the result.

4. An injunction against the printing and publishing in the official organ of a labor federation of the name of a manufacturer in its "We Don't Patronize" and "Unfair" lists, when such printing and publishing are one of the means employed to carry out the unlawful combination and conspiracy to ruin the business of the manufacturer, and is in furtherance of a boycott against him and his product, is not an infringement of the constitutional guaranty of freedom of speech and press.   (Mr. Chief Justice·SHEPARD, dissenting.)

5. But the injunction, under such circumstances, should be confined to the prohibition of the printing and publication of the name of the manufacturer, his business or product, in such list, "in furtherance of the boycott," and should not attempt to regulate the publication and distribution of other matter over which the court has no control.

6. Nor should the injunctive order, under such circumstances, do more than to prohibit the boycott and means of carrying it on; that is, the declaration and threats of boycott or other manner of intimidation against the patrons of the manufacturer or those handling or wishing to purchase his products. The court has no power to compel the fenedants to purchase the products of the manufacturer; but has power to prevent the defendants, their servants and agents, from preventing others from purchasing them.

7. And where there is no evidence in any way connecting counsel for the defendants with the prosecution of the boycott in question, the injunctive order should not be so worded as to include the attorneys for the defendants. ·

8. Such an order should not include a labor federation which is a mere voluntary association; but where it is composed of a large number of members, the order may run against named officers and members who fully represent its membership, and service upon them is sufficient.

9. The form of the injunctive order to be made by the lower court in such a case prescribed.

No. 1916.  Submitted December 10, 1908.  Decided March 11, 1909.

HEARING on an appeal by the defendants from an order of the Supreme Court of the District of Columbia granting an injunction *pendente lite* in a suit to enjoin them from prosecuting a boycott.                    *Modified and affirmed.*

The facts are stated in the opinion.

*Mr. Alton B. Parker, Mr. Jackson H. Ralston, Mr. Frederick L. Siddons,* and *Mr. W. E. Richardson* for the appellants.

*Mr. Daniel Davenport, Mr. James M. Beck,* and *Mr. J. J. Darlington* for the appellees.

Mr. Justice ROBB delivered the opinion of the Court:

This is a bill of complaint on behalf of the Buck's Stove & Range Company, of St. Louis, Missouri, against the American Federation of Labor, a voluntary association, Samuel Gompers, its president, its eight vice presidents, its secretary, and certain other defendants local to the District of Columbia. After hearing upon the bill and defendants' return to the rule to show cause, an injunction *pendente lite* was granted. Evidence was thereupon taken by each side, and a final hearing had which resulted in the following decree:

"The above entitled cause coming on at this time for final hearing, and having been submitted to the court by the respective parties, through their solicitors, upon the pleadings and the evidence, and having been duly considered, it is thereupon by the court, this 23d day of March, A. D. 1908, adjudged, ordered, and decreed that the defendants the American Federation of Labor, Samuel Gompers, Frank Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Connell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C. Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman, their and each of their agents, servants, attorneys, confederates, and any and all persons acting in aid of

or in conjunction with them or any of them, be, and they hereby are, perpetually restrained and enjoined from conspiring, agreeing, or combining in any manner to restrain, obstruct, or destroy the business of the complainant, or to prevent the complainant from carrying on the same without interference from them or any of them, and from interfering in any manner with the sale of the product of the complainant's factory. or business by defendants, or by any other person, firm, or corporation, and from declaring or threatening any boycott against the complainant or its business, or the product of its factory, or against any person, firm, or corporation engaged in handling or selling the said product, and from abetting, aiding, or assisting in any such boycott, and from printing, issuing, publishing, or distributing through the mails, or in any other manner, any copies or copy of the American Federationist, or any other printed or written newspaper, magazine, circular, letter, or other document or instrument whatsoever, which shall contain or in any manner refer to the name of the complainant, its business or its product in the 'We Don't Patronize' or the 'unfair' list of the defendants, or any of them, their agents, servants, attorneys, confederates, or other person or persons acting in aid of or in conjunction with them, or which contains any reference to the complainant, its business or product, in connection with the term 'unfair' or with the 'We Don't Patronize' list or with any other phrase, word, or words of similar import, and from publishing or otherwise circulating, whether in writing or orally, any statement or notice, of any kind or character whatsoever, calling attention to the complainant's customers, or of dealers or tradesmen, or the public, to any boycott against the complainant, its business or its product, or that the same are, or were, or have been, declared to be 'unfair,' or that it should not be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever, or by the public, or any representation or statement of like effect or import, for the purpose of, or tending to, any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, person,

firm, or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession stoves, ranges, heating apparatus, or other product of the complainant, and from threatening or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly, or through orders, directions, or suggestions to committees, associations, officers, agents, or others, for the performance of any such acts or threats as hereinabove specified, and from in any manner whatsoever impeding, obstructing, interfering with, or restraining the complainant's business, trade, or commerce, whether in the State of Missouri, or in other States and Territories of the United States, or elsewhere whersoever, and from soliciting, directing, aiding, assisting, or abetting any person or persons, company or corporation, to do or cause to be done any of the acts or things aforesaid.

"And it is further adjudged, ordered, and decreed that the complainant recover against the defendants the cost of this suit, to be taxed by the clerk, and that it have execution therefor as at law."

The complainant is a manufacturer of stoves and ranges, and its business represents an investment of about $1,000,000, and its sales each year amount to about $1,250,000, and extend throughout the various States and Territories of the United States.

The American Federation of Labor includes nearly two million· wage earners in the United States and Canada. Under the constitution of the Federation its members are classified according to their trades into separate groups or organizations. In St. Louis there is a Metal Polishers Union and various other local unions. In addition there is the St. Louis Central Trades & Labor Union, composed of the local unions. In August, 1906, certain metal polishers employed in complainant's factory became involved in a controversy with the complainant, and simultaneously withdrew from complainant's employ; in other words, struck. Thereupon the Metal Polishers Union declared the complainant "unfair" to organized labor, and published the declaration in their local labor

journal, issued circulars, to the same effect, and in various ways sought to boycott complainant's product. Thereafter application was made to the Central Trades & Labor Union for an indorsement of the boycott, and in November, 1906, such indorsement was made.

The American Federation of Labor, in November of each year, holds a convention, which is composed of delegates from the various subordinate bodies. At the November, 1906, convention, a resolution was introduced for an indorsement of the action of the St. Louis bodies in their controversy with the complainant, and to have complainant published in the "We Don't Patronize" list of the American Federationist, the official organ of the federation. This resolution was referred to the executive council with power to act, and said council, at its next meeting, in March, 1907, placed complainant and its product upon the "We Don't Patronize" list of the federation, and directed the publication thereof in said list in the Federationist, and such publication was thereafter made. The executive council is composed of the president, secretary, treasurer, and the eight vice presidents of the federation. Immediately following the action of said executive council in so placing complainant upon said list of the federation, the following circular was given wide publicity:

Important Notice!

The executive council of the American Federation of Labor, in session at Washington, District of Columbia, March 18-23, 1907, placed the Buck's Stove & Range Company, of St. Louis, on the Unfair list. The publication of this concern will be made in the "We Don't Patronize" list commencing in the May issue of the American Federationist.

This firm is commencing to advertise in daily papers all over the country, endeavoring to offset the above action. All members take notice. Appoint committees to visit the dealers and bring it to the attention of all friends of organized labor.

The effect of the action of the local and national bodies upon

the business of the complainant was immediate and far reaching. In St. Louis dealers were waited upon by officers and representatives of the various local organizations, notably the Central Trades & Labor Union, and were told that they must cease handling complainant's product or they would themselves be boycotted. On October 18, 1907, which, it will be noted, was subsequent to the action of the Federation in indorsing the position of the local bodies, a committee composed of the secretary of the Central Trades & Labor Union, the vice-president of the Metal Polishers Union, and a representative of the International Metal Workers Union, called upon the St. Louis House Furnishing Company and notified the compaany that, if it did not cease handling the product of the complainant, it would be boycotted. The representative of the company informed the committee that the company had about $5,000 worth of Buck's stoves and ranges on hand, and offered to discontinue dealing with the complainant if the committee would purchase the stoves the company had in stock. This the committee refused to do, and left with the admonition that if the company did not stop it would be put upon the "unfair" list. Thereupon, the company continuing to handle the product of the complainant, a boycott against it was prosecuted by the local unions, and circulars were distributed in the following forms:

Boycott
St. Louis House Furnishing Company,
904 Franklin avenue,
Agent for Buck's Stoves and Ranges,
which are
Unfair to Organized Labor.

Indorsed by
$\left\{\begin{array}{l}\text{Metal Polishers Union No. 13.}\\ \text{Stove Mounters No. 86.}\\ \text{Steel Range Workers No. 34.}\\ \text{Central Trades \& Labor Union}\\ \text{of St. Louis and Vicinity.}\end{array}\right.$

H. D. Hackman, a hardware dealer of St. Louis, and the Hencken & Broeken-Kroeger Furniture Company, of East St. Louis, were also boycotted for dealing in complainant's product.

Notices were given other local dealers, but, owing to their acquiescence in the demands made upon them, further action was not taken against them. The action taken in St. Louis is typical of that pursued throughout the country.

The Strauss-Miller Company, of Cleveland, Ohio, was compelled to cancel all back orders and abandon all relations with complainant, owing to the position taken by the labor unions of that city.

The H. L. McElroy Company, of Youngstown, Ohio, after a conference with union representatives, wrote complainant: "It would be a serious calamity for us to be compelled to change our line at this time, but we cannot endanger the success of our entire business by arousing the antagonism and animosity of the labor unions."

Bass & Harbour, of Oklahoma City, after an interview with labor representatives, wrote complainant that they "found it a good deal cheaper to stay out of the trouble than to get into it."

Alonzo Miller, of Staunton, Illinois, wrote that he had been waited upon by a committee from the Miners, Clerks, & Labor Unions, who stated the union's side of the controversy with complainant. The letter closes with: "They therefore forbid me of selling the Bucks stove any way shape or form and if I did they would boycott me and of course I can not ruin my business on account of your stoves." Under date of September 30, 1907, Miller wrote complainant that a motion was carried in the local union to fine any member who should buy a Buck's range or heater. The letter concludes: "If you do not send your man I will send these stoves and ranges back at once, as I will not ruin my business on account of your stoves."

J. H. Kaufman & Company, of Aberdeen, Washington, wrote complainant that they had been advised by the Trades Council that complainant's stoves and ranges had been boycotted by the labor union on account of strike. The letter concludes that, if

the difficulty was not soon settled, the concern would be compelled to discontinue dealings with complainant.

The Brownfield-Canty Carpet Company, of Butte, Montana, wrote in part as follows: "We have been notified by the labor union of Butte that we must stop handling your line, as your company has been declared unfair to labor. We know nothing about the affair only what a circular from the Metal Polishers' Union says, but, as Butte is the strongest union city in the Union, we will have to quit the line."

Baker & Gidcumb, of Harrisburg, Illinois, wrote that the union people of that city would not allow them to handle complainant's goods.

F. W. Schneck & Company, of Milwaukee, Wisconsin, wrote that they had been notified by a "vice president of the International Union of N. A." that the complainant was on the "unfair" list, and that they would be reported as complainant's agents or representatives unless some settlement was made.

A letter dated September 9, 1907, from one of complainant's customers at Great Falls, Montana, stated that their plans to put in a car load of complainant's product had been "knocked in the head by the unions in the town" requesting the firm not to handle complainant's product, which request, the firm added, "is equal to a demand."

A letter dated October 12, 1907, from the Davenport Furniture and Carpet Company, of Davenport, Iowa, contained the information that the firm had been waited on by labor union representatives, "who stated there was now a boycott on against your company and would be against all people handling your product."

A letter from Mobile, Alabama, stated that the firm had received a notice from the local organization of the boycott against complainant's stoves, and a request that the firm cease handling them, which, the letter adds, "of course I refused to do, telling them that we had contracted ahead with you for your stoves, and that we were compelled to use them, and asked them not to put us on the unfair list, owing to our circumstances; but I don't know what the committee will do."

A letter from Louisville, Kentucky, from one of complainant's customers, stated that they had been notified by representatives of the local labor organizations that, if they handled complainant's stoves, they were liable to be considered as unfair to union labor.

A letter from Galesburg, Illinois, read in part as follows: "A committee representing the Buffers & Metal Polishers Union of this city called upon us to-day at the request of a similar union in your city. They claim you are on what they call 'the unfair list,' and requested us to take action in the matter and discontinue handling your goods. This looks like 'boycott' to us. They are coming again to talk the matter over."

F. S. Bode, of Kenosha, Wisconsin, wrote that he needed stoves, but could not handle them owing to the labor unions in his city. His letter concludes: "Always had nice dealings with you but I'm forced to do this."

A letter from the Schunk-Marquardt Company, of Toledo, Ohio, stated that "again we have been notified by the labor unions that the Buck Stoves & Range Company are still on the unfair list, and that if we continue to handle Buck stoves and ranges they will boycott us. Not only on Buck stoves and ranges, but on all hardware."

Similar letters were received from many other cities, but we do not deem it necessary to make further allusion to them in this connection.

Different traveling salesmen of complainant testified to loss of patronage in different cities because of representations made by representatives of labor unions that dealers handling Buck's stoves would themselves be boycotted.

The bill charges that the publication of concerns in the "We Don't Patronize" list of the Federationist is "for the purpose of singling out and designating individuals and concerns so named, and of notifying their customers, and the public generally, and all the members of said twenty-seven thousand local unions in their several localities, and of the several national and international unions, state federations, and central city labor unions that they are to be treated by them as unjust and

hostile to the unions upon whose application such action is based, and that their business, products, and customers are to be boycotted by each and all the members of the American Federation of Labor and their friends and sympathizers, and that the whole power of its vast organization and combination is to be used against them to injure and destroy their business thereby, and that all the members of the American Federation of Labor are to abstain from purchasing or using said products, and from dealing with any person who purchases, handles, or uses said product." The bill proceeds to set out specific instances of boycotts against complainant's patrons because they had continued to handle complainant's stoves.

In answer to these averments in respect to the publication in the "We Don't Patronize" list of the Federationist defendants "deny that the purpose thereof is to use 'the whole power of its (American Federation of Labor) vast organization and combination' 'to injure and destroy their (those not patronized) business thereby.' They deny that said 'We Don't Patronize' list prohibits or interferes with any constituent organization or its members 'dealing with any person who purchases, uses, or handles said product.' " They also disclaim knowledge concerning specific instances of boycotting mentioned in the bill.

The first question, therefore, to be determined, is whether the defendants were connected with, and, under this complaint, responsible for, the acts above set forth. The complainant, on the one hand, contends that the action of said executive council and the publication in the "We Don't Patronize" list of the Federationist signified to each labor union throughout the land that they were to boycott not only complainant's product, but all those who, upon demand, did not cease business dealings with complainant. In other words, that what actually happened was the result intended. The defendants, on the other hand, earnestly contend that the sum total of their offending has been a concerted severance of business intercourse with complainant, and that they are not responsible for what actually occurred.

The record shows that Mr. Gompers has been the president

of the federation since 1886, and that he is a man of ability and a natural leader of men. It is apparent from a perusal of the record that during all these years he has been a dominant factor in the affairs of the federation, and that the general policy of organized labor throughout the land is shaped and controlled by the association of which he is the president. The record shows that a very large number of boycotts have been declared and prosecuted by the federation in the past, and that, as a result of these boycotts, considerable litigation has ensued. The decisions of the courts in the various labor cases where the boycott has been under consideration have been the subject of frequent discussion by Mr. Gompers, and he has frequently issued instructions and advice to the members of the federation, both in the annual conventions of the federation and through the editorial columns of the Federationist. We will briefly review the previous position of the federation in respect to the boycott in our effort to ascertain the significance of the "We Don't Patronize" list.

In the annual convention of 1894, delegates from an organization that had refused or neglected to enforce a boycott against a wholesale clothing house were not seated, and it was resolved "to recommend to the public and organized labor to refuse to patronize or deal with any retail clothier handling the goods of said manufacturers."

The convention of 1899 was held at Detroit, Michigan. Mr. Gompers, in his annual report to that convention, under the head "Boycott—The Right and Practice," said: "It has been my purpose for some time to present, in a comprehensive manner, the right of the workers to employ the power of the 'boycott.' With that object in view, the editorial appearing in the October issue of the American Federationist, under the caption, 'The Boycott as a Legitimate Weapon,' was written and published. It is commended to your serious consideration."

This report was referred to a committee, which, in its report, indorsed the above editorial, and urged its careful reading. In the editorial referred to Mr. Gompers said: "A sympathetic boycott is as legal and legitimate as a sympathetic strike. Just

as men may strike for any reason, or without any reason at all, so may they suspend dealings with merchants or others for any reason or for no reason at all. Thus a boycott may extend to an entire community without falling under the condemnation of any moral or constitutional or statutory law. But I shall be triumphantly told, boycotters never do confine themselves to moral suasion and appeal; that they resort to threats, intimidation, and coercion, and it is this which makes what is called 'compound boycotting'—that is, boycotting which extends to parties not concerned in the original dispute—criminal and aggressive. * * * This sounds very plausible. It is easy to deduce from such premises that boycotters interfere with property rights and the pursuit of lawful callings, and that, under the national and state Constitutions, to say nothing about explicit anticonspiracy laws, they are to be held civilly and criminally liable. * * * But this argument about the employment of threats and intimidation is fallacious and superficial. Its apparent validity disappears when, not satisfied with ugly-looking words, we demand precise definitions. No one pretends for a moment that it would be proper for a boycotter to approach a merchant and say, 'You must join us in suspending all dealings with that employer or newspaper or advertiser, on pain of having your house set on fire or physical assault.' This would be an unlawful threat, and people who would try to enlist others in their campaign by threats of this character would certainly be guilty of a criminal conspiracy. Do boycotters use such threats? Do they contend for the right to employ force or threats of force? Our worst enemies do not contend that they do. They 'threaten,' but what do they threaten? They 'intimidate,' but how? Let Judge Taft, who issued his sweeping antiboycotting injunction, be a witness on this point. He said: 'As usually understood, a boycott is a combination of many to cause a loss to one person by coercing others, against their will, to withdraw from him their beneficial interests through threats that, unless those others do so, the many will cause similar loss to them.' * * * No man in his senses will dispute this axiomatic proposition; namely, that

a man has a right to threaten that which he has a right to carry out. * * * You may tell a man that, if he does a certain thing, you will never speak to him or call at his house. This is a threat, but it is a threat that you have a right to make. Why? Because you have a right to do what you threaten. The same thing is strictly true of boycotting. * * * A man may be coerced by actual force, by the threat of force, or by indirect means which the law cannot and does not prohibit. Coercion by a threat to suspend dealings is, to revert to our illustration, in the same category with coercion through a threat to cease friendly intercourse. * * * Labor claims the right to suspend dealings with any and all who refuse to support what it considers its legitimate demand."

In his testimony Mr. Gompers took occasion to say that he had not uttered a word of which he was not proud and which he would not reaffirm. Counsel for the defendants in their brief refer to this editorial as correctly setting forth the position of organized labor in respect to the boycott.

The 1905 convention adopted a report from the committee on boycotts, in which it was stated: "We must recognize the fact that a boycott means war, and to successfully carry on a war we must adopt the tactics that history has shown are most successful in war. The greatest master of war said that 'War was the trade of a barbarian, and the secret of success was to concentrate all your forces upon one point of the enemy, the weakest, if possible.' In view of these facts, the committee recommends that the State federations and central bodies lay aside minor grievances and concentrate their efforts and energies upon the least number of unfair parties or places in their jurisdiction. One would be preferable. If every available means at the command of the State federations and central bodies were concentrated upon one such, and kept up until successful, the next on the list would be more easily brought to terms, and within a reasonable time none opposed to fair wages, conditions, or hours but would be brought to see the error of their ways and submit to the inevitable. Under the present system our efforts are largely wasted and our ammunition scattered. Let us

reduce the boycotts to the lowest possible number and concentrate our efforts upon those, and we feel certain better results will be obtained."

In an editorial in the February, 1908, Federationist, Mr. Gompers reviewed the opinion of the learned justice below in issuing the temporary injunction, and, among other things, said: "Neither coercion, threats, nor conspiracy, *in the unlawful sense* (italics ours), have been resorted to, yet the whole injunction is based upon this wrong assumption."

At the annual convention of the federation at Norfolk, Virginia, in 1907, Mr. Gompers, in his report, discussed the boycott against complainant, and its causes, and also this suit, which had then been commenced. After stating his version of the original controversy with complainant, Mr. Gompers continued: "The investigation demonstrated clearly Mr. Van Cleave's hostile purpose towards the organization in question (International Brotherhood of Foundry Employees), and every effort at an amicable adjustment was fruitless. It was then that my colleagues aand myself, the executive council, approved the position and action of the organization affected, and this fact was published in the American Federationist."

A resolution was thereupon introduced and adopted: "That each central body affiliated with A. F. of L. be and is hereby instructed to appoint a committee who shall conduct and manage a 'campaign of education' among the membership affiliated with their central body, as well as dealers in stoves and ranges in their locality, and thoroughly inform them of the entire facts of the dispute between the Metal Polishers, Buffers, Platers, Brass & Silver Workers' Union of North America, the Brotherhood of Foundry Employees, also as to the attitude of J. W. Van Cleave and the Manufacturers' Association towards organized labor. Be it further

"Resolved, That the said committee shall report on the first of each month to the officers of the A. F. of L. the progress of the 'campaign of education,' together with a complete list of all dealers in their locality who are handling and selling the product of the Buck Stove & Range Company. Be it further

"Resolved, That all commissioned organizers of the A. F. of L. shall report on the first of each month to the officers of the A. F. of L. the progress made in this 'campaign of education' by the different committees of the different central bodies in their respective districts, and also render such aid to all committees as lay in their power."

The committee on boycotts recommended "that the executive council be instructed to remove from the 'We Don't Patronize' list the names of firms in all instances wherein the executive council has knowledge that the national or international union responsible for the boycott are not · aggressively pushing the same."

Under date of November 26, 1907, an official statement over the signature of Mr. Gompers as president, and attested by Frank Morrison as secretary, "By order of the executive council of the American Federation of Labor," was sent out "to all organized labor and friends." In this statement we find the following: "As you are well aware, so inimical to the welfare of labor was the Buck's Stove & Range Company's management that the organization concerned felt obliged to declare the product of that company unfair. The workmen's organization appealed to the American Federation of Labor to indorse its action. *After due investigation, that indorsement was given and is still further affirmed.* The circumstances leading to this action are so widely known that they need not be here recounted."

It will thus be seen that in the nomenclature of the federation, "we don't patronize" is synonymous with and equivalent to "boycott;" the publication of the former being notice to the craft that the latter is to follow. The record shows that during the year 1907 Mr. Gompers was in the city of St. Louis at least four different times, and that while there he was in conference with some of the labor leaders who were responsible for the inauguration of the boycott against complainant. It further appears that, in his lecture tours, and in his official capacity as president of the federation, he frequently visited other sections of the country. It also appears that the federation has

in the field over 1,200 so-called "organizers," whose duty in part appears to be to aid in pushing boycotts and to report thereon to the federation. Nowhere in his testimony, nor in the testimony of any of the defendants who were called as witnesses, is the denial made that the publication of complainant in the "We Don't Patronize" list was not intended to inaugurate exactly the sort of boycott that was in fact prosecuted. Nowhere does it appear in the testimony of these defendants that any one of them ever even suggested to any of the subordinate organizations and membership of the federation that they modify in any way their boycott against complainant. It will be noted that the answer to the specific averment of the bill hereinbefore set out only goes so far as to deny that the "We Don't Patronize" list *prohibits* or *interferes* with any constituent organization or its members dealing with persons who handle complainant's stoves. The answer does not deny that the "We Don't Patronize" list does not indicate to subordinate organizations the course of conduct that was in fact pursued.

It is also highly significant that throughout the country the notice to dealers that they must cease handling complainant's product was not the sporadic and unauthorized act of individual unionists, but, on the contrary, the act of accredited leaders. From whom did they derive their inspiration? Was it a mere coincidence that they acted in such perfect harmony and ever to the same end and purpose? We think not.

In the editorial to which allusion has been made, and which was brought to the attention of and indorsed by the federation in convention assembled, Mr. Gompers contended for the right to do and advised the doing of exactly what was done in this case.

The bill of complaint was filed August 19, 1907. The defendants were therein notified of the exact nature of the boycott that was then being prosecuted against complainant; but, notwithstanding the knowledge thus obtained, we find the executive council of the federation on *November 26, 1907,* reaffirming without qualification and in an official statement, as before stated, what had been done.

In view of all this we think there is no room for doubt that this combination or boycott which had its inception in St. Louis was inaugurated in accordance with the settled policy of the American Federation of Labor, and that when the federation in due course approved and indorsed the same, it acted with full knowledge not only of what had already occurred, but of what would be likely to follow. If, therefore, anyone is responsible for what happened, these defendants certainly are. *Connecticut Mutual L. Ins. Co.* v. *Hillmon,* 188 U. S. 218, 47 L. ed. 451, 23 Sup. Ct. Rep. 294; *United States* v. *Babcock,* 3 Dill. 581, Fed. Cas. No. 14,487; *United States* v. *Standard Oil Co.* 152 Fed. 294.

We approach a consideration of the legal questions involved in this case with a full realization of their widespread importance. We realize to the fullest extent that through the instrumentality of labor unions much has been accomplished for the betterment and amelioration of the conditions surrounding those who toil. In common with all who have the welfare of their country at heart, we are gratified that such progress has been made in behalf of labor, and we are proud of the intelligence, thrift and patriotism of the American workingman. We believe him to be anxious for his rights, but, like all other good citizens, desirous of obeying the law. We would not if we could, and could not if we would, take from him the right of organization. We would accord him every right under the law that his employer enjoys, and we believe mature consideration will fully convince him, and those whose solemn responsibility it is to counsel and guide him, that he should ask for no more.

Eliminating, as we have, all collateral considerations, the clean-cut question is presented, whether a combination, such as was entered into in this case, which has for its object the coercion of a given firm through the instrumentality of the boycott, is lawful.

In the Declaration of Independence, it is stated that among the inalienable rights with which the Creator has endowed all men are life, liberty, and the pursuit of happiness. The 5th and 14th Amendments to the Constitution contain provisions

against deprivation of life, liberty, or property without due process of law; the former Amendment operating upon Congress, the later upon the several States.

Mr. Justice Harlan, speaking for the court in *Powell* v. *Pennsylvania*, 127 U. S. 684, 32 L. ed. 256, 8 Sup. Ct. Rep. 992, said: "The main proposition advanced by the defendant is that his enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade, and of acquiring, holding, and selling property, is an essential part of his rights of liberty and property, as guaranteed by the 14th Amendment. The court assents to this general proposition as embodying a sound principle of constitutional law."

Again, in *Allgeyer* v. *Louisiana*, 165 U. S. 589, 41 L. ed. 835, 17 Sup. Ct. Rep. 427, the court quoted with approval the following from the concurring opinion of Mr. Justice Bradley in *Butchers' Union S. H. & L. S. L. Co.* v. *Crescent City L. S. L. & S. H. Co.* 111 U. S. 762, 28 L. ed. 588, 4 Sup. Ct. Rep. 652; "The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence. * * * This right is a large ingredient in the civil liberty of the citizen."

In *Hopkins* v. *Oxley Stave Co.* 28 C. C. A. 99, 49 U. S. App. 709, 83 Fed. 912, the circuit court of appeals for the eighth circuit said: "The right of an individual to carry on his business as he sees fit, and to use such implements or processes of manufacture as he desires to use, provided he follows a lawful avocation, and conducts it in a lawful manner, is entitled to as much consideration as his other personal rights; and the law should afford protection against the efforts of powerful combinations to rob him of that right, and coerce his will by intimidating his customers and destroying his patronage."

It will thus be seen that the supreme law of the land guarantees protection to all who desire to engage in a lawful calling or business, subject, of course, to such reasonable regulations as it may be necessary to impose. And, when Mr. Gompers advises

his followers that a man is entitled to protection against a threatened destruction of his house, but none against a malicious destruction of the business which enables him to maintain his house, Mr. Gompers is mistaken. Was the combination entered into by appellants unlawful ? A conspiracy has been defined as a combination of two or more persons to accomplish something unlawful, or something not in itself unlawful by unlawful means. *Pettibone* v. *United States,* 148 U. S. 203, 37 L. ed. 422, 13 Sup. Ct. Rep. 542. In determining whether the acts of the appellants are within this definition we will here review a few of the adjudged cases on this branch of the law.

*Callan* v. *Wilson,* 127 U. S. 540, 32 L. ed. 223, 8 Sup. Ct. Rep. 1301, was an information in the police court of the District of Columbia, charging the defendants with a conspiracy to prevent certain members of a local union, who had been expelled therefrom, from pursuing their calling as musicians in the United States. The conspiracy, as set forth in the complaint, was to be effected by the defendants and the members of other associations with which they were affiliated refusing to work in any capacity with the expelled members, or with, or for any person or firm working with or employing them, and by warning and threatening every person or firm employing such expelled members that, if they did not cease to employ and refuse to employ them, they would not receive the custom or patronage either of the persons so conspiring or of the members of affiliated organizations. The question before the court was whether the offense charged was a petty offense or one of so serious a nature that the defendants were entitled to a trial by jury. The court held that the offense charged was of the latter character.

Mr. Justice Harlan, in reviewing *Callan* v. *Wilson,* in *Arthur* v. *Oakes,* 25 L.R.A. 414, 4 Inters. Com. Rep. 744, 11 C. C. A. 209, 24 U. S. App. 239, 63 Fed. 310, said: "It thus appears that combinations and conspiracies by two or more persons, with the intent to injure the rights of others, were illegal at common law." He further said : "According to the principles of the common law, a conspiracy upon the part of two or more persons, with the intent, by their combined power, to wrong others or to

prejudice the rights of the public, is, in itself, illegal, although nothing be actually done in execution of such conspiracy. This is fundamental in our jurisprudence. So a combination or conspiracy to procure an employee or body of employees to quit service, in violation of the contract of service, would be unlawful, and, in a proper case, might be enjoined if the injury threatened would be irremediable at law. It is one thing for a single individual or for several individuals, each acting upon his own responsibility, and not in co-operation with others, to form the purpose of inflicting actual injury upon the property or rights of others. It is quite a different thing in the eye of the law for many persons to combine or conspire together with the intent not simply of asserting their rights, or of accomplishing lawful ends by peaceful methods, but of employing their united energies to injure others or the public. An intent upon the part of a single person to injure the rights of others or of the public is not in itself a wrong of which the law will take cognizance, unless some injurious act be done in execution of the unlawful intent. But a combination of two or more persons with such an intent, and under circumstances that give them, when so combined, a power to do an injury they would not possess as individuals, acting singly, has always been recognized as in itself wrongful and illegal."

*Quinn* v. *Leathem* [1901] A. C. 495, contains a very exhaustive discussion of the subject. A trade union notified Leathem, a butcher, that they would not work for him, nor for one Munce, one of his customers, unless he unionized his shop and discharged his then assistants. This Leathem refused to do, whereupon the union notified Munce that they would not work for him if he bought Leathem's meat, and, because of such notice, Munce withdrew his trade from Leathem, who brought an action for damages against members of the union who were responsible for what was done. Lord Macnaghten said: "A man may resist without much difficulty the wrongful act of an individual. He would probably have at least the moral support of his friends and neighbors; but it is a very different thing * * * when one man has to defend himself against many, combined

to do him wrong." Lord Brampton, quoting Lord Halsbury in another case, said: "The liberty of a man's mind and will to say how he should bestow himself and his means, his talents and his industry, was as much a subject of the law's protection as was that of his body." [*Mogul S. S. Co.* v. *McGregor, G. & Co.* [1892] A. C. 38.] The plaintiff was permitted to recover.

In *Thomas* v. *Cincinnati, N. O. & T. P. R. Co.* 4 Inters. Com. Rep. 788, 62 Fed. 818, the court said: "What were the purposes of this combination of Debs, Phelan, and the American Railway Union board of directors? They proposed to inflict pecuniary injury on Pullman by compelling the railway companies to give up using his cars, and, on the refusal of the railway companies to yield to compulsion, to inflict pecuniary injury on the railway companies by inciting their employees to quit their services, and thus paralyze their business. * * * But the combination was unlawful without respect to the contract feature. It was a boycott. The employees of the railway companies had no grievance against their employers. Handling and hauling Pullman cars did not render their services any more burdensome. They had no complaint against the use of Pullman cars as cars. They came into no natural relation with Pullman in handling the cars. He paid them no wages. He did not regulate their hours, or in any way determine their service. Simply to injure him in his business, they were incited and encouraged to compel the railway companies to withdraw custom from him by threats of quitting their service, and actually quitting their service. This inflicted an injury on the companies that was very great, and it was unlawful, because it was without lawful excuse."

In *Barr* v. *Essex Trades Council,* 53 N. J. Eq. 111, 30 Atl. 881, the complainant, the proprietor of a daily newspaper, decided, against the wishes of a local typographical union of which his employees were members, to use plate matter in making up his paper. Upon the carrying into effect of his decision the union immediately interested withdrew its indorsement of the paper and reported the matter to the trades council, an amalgamation of local unions, which issued a circular calling on all

friends to boycott the paper and to cease buying and advertising in it.   An active campaign was inaugurated in furtherance of the boycott, and patrons of the paper were threatened with the opposition of organized labor unless they withdrew their support from the paper.   An injunction was granted, restraining the further prosecution of the boycott.

In *Beck* v. *Railway Teamsters' Protective Union,* 118 Mich 497, 42 L.R.A. 407, 74 Am. St. Rep. 421, 77 N. W. 13, it was held that the boycotting of one who refuses to accede to the demand of the union is unlawful, where the means used to prevent persons from dealing with the person boycotted are threatening in their nature, and tend naturally to overcome, by fear of loss of property, the will of others, and compel them to do what they would not otherwise do, although such means are unaccompanied by actual violence or threats of violence.

So far as we are advised, the decisions of the Federal and State courts throughout the country, with the single exception of Montana, are in harmony with those to which specific allusion has been made.   We do not deem it necessary, however, to do more than cite a few of them: *Cœur D'Alene Consol. Min. Co.* v. *Miners' Union,* 19 L.R.A. 382, 51 Fed. 260; *Toledo, A. A. & N. M. R. Co.* v. *Pennsylvania Co.* 19 L.R.A. 387, 5 Inters. Com. Rep. 522, 54 Fed. 730; *United States* v. *Weber,* 114 Fed. 950; *Seattle Brewing & Malting Co.* v. *Hansen,* 144 Fed. 1011; *My Maryland Lodge No. 186 of Machinists* v. *Adt.* 100 Md. 238, 68 L.R.A. 752, 59 Atl. 721; *Vegelahn* v. *Guntner,* 167 Mass. 92, 35 L.R.A. 722, 57 Am. St. Rep. 443, 44 N. E. 1077; *Plant* v. *Woods,* 176 Mass. 492, 51 L.R.A. 339, 79 Am. St. Rep. 330, 57 N. E. 1011; *Berry* v. *Donovan,* 188 Mass. 353, 5 L.R.A.(N.S.) 899, 108 Am. St. Rep. 499, 74 N. E. 603, 3 A. & E. Ann. Cas. 738; *Erdman* v. *Mitchell,* 207 Pa. 79, 63 L.R.A. 534, 99 Am. St. Rep. 783, 56 Atl. 327; *Purvis* v. *Local No. 500, U. B. C. & J.* 214 Pa. 348, 12 L.R.A.(N.S.) 642, 112 Am. St. Rep. 757, 63 Atl. 585, 6 A. & E. Ann. Cas. 275; *State* v. *Stewart,* 59 Vt. 273, 59 Am. Rep. 710, 9 Atl. 559; *Boutwell* v. *Marr,* 71 Vt. 1, 43 L.R.A. 803, 76 Am. St. Rep.

746, 42 Atl. 607; *Charles A. Olcott Planing Mill Co.* v. *Fuelle* (Mo.) 114 S. W. 1013.

From these decisions it will be gathered that the boycott, as generally understood, is a combination to harm one person by coercing others to harm him. The combination in this case, in our opinion, not only answers this definition of a boycott, but also the definition previously given of a common-law conspiracy. The immediate purpose and result of this combination, as we have seen, was to interfere with complainant's lawful business, and to deprive complainant and its customers of their right to trade intercourse. It matters not that the remote object of the combination was to benefit such members of the local unions as should be employed by complainant, because the law looks to the immediate, and not to the incidental, object of the combination. If the immediate object is unlawful, the combination is unlawful. If the immediate object is lawful, as in the case of legitimate trade competition, including strikes, the combination, generally speaking, is lawful. This distinction will be found in the cases cited.

That no physical coercion was practised in this case does not alter our conclusion, since restraint of the mind, as the evidence in this case clearly demonstrates, is just as potent as a threat of physical violence. *Barr* v. *Essex Trades Council* and *Purvis* v. *Local No. 500, U. B. C. & J. supra.*

The contention is put forward that, inasmuch as each member of the federation has the right to bestow his trade where he will, according to his whim or fancy, it cannot be unlawful for a combination of members to do what each, acting separately, may do, and that, therefore, the combination may lawfully discontinue or threaten to discontinue business intercourse with a given firm and all who handle its product; or, to state the proposition bluntly, that the boycott, as previously defined, is lawful. To admit the soundness of this contention is to give legal support and standing to an engine of harm and oppression utterly at variance with the spirit and theory of our institutions, place the weak at the mercy of the strong, foster monopoly, permit an unwarranted interference with the natural course of

trade, and deprive the citizen of the freedom guaranteed him by the Constitution.   The loss of the trade of a single individual ordinarily affects a given dealer very little.   Being discriminating, the purchasing public, if left free to exercise its own judgment, will not act arbitrarily or maliciously, but will be controlled by natural considerations.   But a powerful combination to boycott immediately deflects the natural course of trade, and ruin follows in its wake because of the unlawful design of the conspirators to coerce or destroy the object of their displeasure.   In other words, it is the conspiracy, and not natural causes, that is responsible for the result.   From time immemorial the law has frowned upon combinations formed for the purpose of doing harm, and we think public policy demands that such a combination as we have found to exist in this case be declared unlawful.   As was said by Mr. Chief Justice Fuller of a similar combination:   "The combination charged falls within the class of restraints of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of trade except on conditions that the combination imposes; and there is no doubt that (to quote from the well-known work of Chief Justice Earle on Trade Unions) 'at common law every person has individually, and the public also has collectively, a right to require that the course of trade should be kept free from unreasonable obstruction.' "   *Loewe* v. *Lawlor,* 208 U. S. 294, 52 L. ed. 496, 28 Sup. Ct. Rep. 301.   The action in that case was brought under the Sherman act, but the quotation given nevertheless is applicable here.   In our opinion, it is more important to wage earners than to employers of labor that we declare this combination unlawful, for, if wage earners may combine to interfere with the lawful business of employers, it follows that employers may combine to coerce their employees.

It is next contended that the decree entered in this case is an infringement of the constitutional guaranty of freedom of speech and of the press.   In so far as it seeks to restrain acts in furtherance of the boycott we do not think it constitutes either a censorship of the press or an abridgment of the right of free speech.   An unlawful combination was found to exist, which,

unless checked, would destroy complainant's busines and leave complainant without adequate redress. The court, therefore, very properly sought to restrain the cause of the mischief,— the *unlawful combination.* The "We Don't Patronize" or "Unfair" list and oral declarations of the boycott were included in the decree because they were among the means employed in carrying out the unlawful design.

Courts of equity have refused to enjoin the publication of a mere libel, but they have not hesitated to enjoin either written or oral publications constituting a means to the carrying out of an unlawful combination. Thus, in *Vegelahn v. Guntner, supra,* an injunction was granted restraining threats against those willing to be employed, such threats being a step in the prosecution of the conspiracy. In *Beck* v. *Railway Teamsters' Protective Union, supra,* "picketing and distribution of boycotting circulars and all acts of intimidation and coercion" were enjoined. In *Casey* v. *Cincinnati Typographical Union No. 3,* 12 L.R.A. 193, 45 Fed. 135, the publication and circulation of posters, handbills, and circulars printed and circulated in furtherance of the conspiracy were enjoined. Similar decrees were entered in *Cœur D'Alene Consol. Min. Co.* v. *Miners' Union; Barr* v. *Essex Trades Council; Erdman* v. *Mitchell; Purvis* v. *Local No. 500, U. B. C. & J.;* and *My Maryland Lodge No. 186 of Machinists* v. *Adt;—supra; Jackson* v. *Stanfield,* 137 Ind. 592, 23 L.R.A. 588, 36 N. E. 345, 37 N. E. 14; *Brown* v. *Jacobs'* *Pharmacy,* 115 Ga. 439, 57 L.R.A. 547, 90 Am. St. Rep. 126, 41 S. E. 553. In *Thomas* v. *Cincinnati, N. O. & T. P. R. Co.* 4 Inters. Com. Rep. 788, 62 Fed. 818, the court said: "It would be strange, indeed, if that right [of free speech] could be used to sustain the carrying out of such an unlawful and criminal conspiracy as we have seen this to be." In *Swift & Co.* v. *United States,* 196 U. S. 375, 49 L. ed. 518, 25 Sup. Ct. Rep. 276, Mr. Justice Holmes, speaking for the court, said: "It is suggested that the several acts charged are lawful and that intent can make no difference. But they are bound together as parts of a single plan, and the plan may make the parts unlawful." Again, in *Aikens* v. *Wisconsin,* 195 U. S.

206, 49 L. ed. 160, 25 Sup. Ct. Rep. 3, the same justice said: "No conduct has such an absolute privilege as to justify all possible schemes of which it may be a part. The most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot, and, if it is a step in a plot, neither its innocence nor the Constitution is sufficient to prevent the punishment of the plot by law."

The cases relied upon by appellants are not in point here for the reason that they involved mere libels, which, as above stated, courts of equity have uniformly refused to restrain.

Oral and written declarations in furtherance of a conspiracy are tentacles of the conspiracy, and must be treated as such, and not as independent acts. It would be an anomalous situation, indeed, if a court of equity, having ample jurisdiction to restrain the carrying out of a conspiracy to deprive a citizen of rights guaranteed him by the Constitution, could be prevented from affording relief by the interposition of such a claim as is here made. Freedom of action is at least as sacred as an untrammeled tongue or pen, and those who conspire to defeat the former right ought not to be permitted to interpose a plea based upon the latter.

But we think the decree in this case goes too far when it enjoins the publication or distribution through the mails or otherwise of the Federationist or other periodicals or newspapers containing any reference to complainant, its business or product, as in the "We Don't Patronize" or "Unfair" list of the defendants. The court below found, and in that finding we concur, that this list in this case constitutes a talismanic symbol indicating to the membership of the federation that a boycott is on and should be observed. The *printing* of this list, therefore, was what the court sought to prevent, and what, in our opinion, the court had power to prevent; but the decree should stop there, and not attempt to regulate the publication and distribution of other matter over which the court has no control. In other words, this branch of the decree should merely prohibit the printing of complainant, its business or product, in the "We Don't Patronize" or "Unfair" list *in furtherance of the boycott.*

The italicized words should be added, for, when the conspiracy is at an end, the federation will have the same right that any association or individual now has to comment upon the relations of complainant with its employees. It is the existence of the conspiracy that warrants the court in prohibiting the printing of this list. Manifestly, when the conspiracy ends, the prohibition ought also to end.

We are of the opinion that the decree is too broad in other respects. It, being based upon a finding that a conspiracy to boycott exists, should deal with acts of commission, and not acts of omission. To be more specific, we think it should attempt no more than a prohibition of the boycott and the means of carrying it on; that is, the declarations or threats of boycott or other manner of intimidation against complainant's patrons or those handling or wishing to purchase its product. We have no power to compel the defendants to purchase complainant's stoves. We have power to prevent defendants, their servants and agents, from preventing others from purchasing them.

There being no evidence in any way connecting counsel for defendants with the prosecution of this boycott, we think the decree should not be so worded as to include them. While "attorneys" probably was used in the decree in a tautological sense, its inclusion at all was unnecessary.

The point is made that this decree should not include the federation, because it is a mere voluntary association. This point appears to be well taken, since there is no such legal entity as an unincorporated association. *Taff Vale R. Co.* v. *Amalgamated Soc.* [1901] A. C. 426. This, however, is not a suit at law for damages, but a proceeding in equity against certain representative members of an association composed of a large number of members, service upon all of whom individually would be impossible. In such a case it has been held "that a number of members may be made parties defendant as representative of the class." *Pickett* v. *Walsh,* 192 Mass. 590, 6 L.R.A.(N.S.) 1067, 116 Am. St. Rep. 272, 78 N. E. 753, 7 A. & E. Ann. Cas. 638. We think it clear in this case that the

named members of the federation fully represent its membership, and that service upon them is sufficient.

For the reasons given the decree is modified and affirmed as follows: It is adjudged, ordered, and decreed that the defendants Samuel Gompers, Frank Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Connell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C. Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman, individually and as representatives of the American Federation of Labor, their and each of their agents, servants, and confederates, be, and they hereby are, perpetually restrained and enjoined from conspiring or combining to boycott the business or product of complainant, and from threatening or declaring any boycott against said business or product, and from abetting, aiding, or assisting in any such boycott, and from directly or indirectly threatening, coercing, or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in complainant's product, and from printing the complainant, its business or product, in the "We Don't Patronize" or "Unfair" list of defendants in furtherance of any boycott against complainant's business or product, and from referring, either in print or otherwise, to complainant, its business or product, as in said "We Don't Patronize" or "Unfair" list, in furtherance of any such boycott.

The costs of this appeal are equally divided between appellants and appellee. *Modified and affirmed.* —

An appeal by the appellants to the Supreme Court of the United States was allowed March 26, 1909.

Mr. Justice VAN ORSDEL, concurring:

I concur fully in the conclusion reached by my associate, Mr. Justice Robb. I do not desire to take issue with the reasoning employed by him in arriving at that conclusion. Hence, what

I may say will be rather in addition to, than in criticism of, anything that appears in the opinion.

It is insisted that the decree of the court below deprives the defendants of the right of freedom of contract, of free speech, and of a free press, as guaranteed in the Federal Constitution. If this contention is well founded, it is clear that a court of equity cannot be used for such a purpose. The equitable writ of injunction is an agency placed in the hands of the court to protect rights and restrain wrongs where the law is remediless; but it should never be used as an instrument of oppresion. This great writ for the enforcement of equitable rights was not intended to be used as a short-cut to escape the inconvenience of a suit at law, with the chances involved in submitting the issue to the judgment of a jury. Where there is legal redress and a right of trial by jury, a court of equity is powerless to intervene and deprive the citizen of that right, except to avoid a multiplicity of suits, or where the legal remedy is inadequate. The guaranty of freedom of speech and freedom of the press was placed in the Constitution to prevent government censorship, as practised at that time in many of the governments of Europe. That, therefore, which was placed in the organic law, to accomplish an end so essential to the freedom and general welfare of the people, is hardly susceptible of nullification by judicial decree.

The courts of the United States will be useful and fulfil the functions for which they were created, only so long as they are content to interpret the laws in conformity with the limitations of the Constitution. Any attempt to disobey these restrictions is a step across the danger line; and will, of necessity, lead to judicial arrogance, tyranny, and oppression. If, in any particular, we have outgrown the Constitution, the remedy is plain and simple. It is within the power of the people to amend it; but this prerogative is not reposed in the courts.

It must be remembered, however, that there is a point where the right of free speech and a free press ends, and unlawful interference with personal and property rights begins. When the citizen passes this point, he can no longer claim the protection of

the Constitution.    It protects no one in uttering or disseminating slanderous or libelous matter.    A citizen cannot invoke the protection of the constitutional guaranty of free speech and a free press to destroy the right of property secured to his neighbor by the same instrument.    There is nothing complained of in this case for which there is not a specific legal remedy provided.    Hence, the only excuse for a court of equity taking jurisdiction is because the legal remedy is inadequate to prevent irreparable injury and avoid a multiplicity of suits.    This is the one instance when equity jurisdiction will be assumed and exercised with the utmost caution; not assuming anything that can be avoided, or taking jurisdiction where the legal remedy is at all adequate.    I agree, however, that, within these limitations, the record presents a case calling for equitable relief.

The word "boycott" at the present time is no more obnoxious than was the word "strike" a quarter of a century ago.    Then it was sought through the courts of equity to invoke the injunctive writ to restrain laboring men from organizing a peaceable strike.    In some instances, inferior Federal courts granted injunctions, but they were never upheld in the superior courts of the country.    It is well settled now that a man, or a number of men, may refuse to continue to work for their employer, and they may combine for the purpose of organizing a strike.    They may advise other to quit work and join in the strike, so long as no contractual rights are invaded, and they may advise others not to engage their services to the employer against whom the strike is directed.    All this is within their constitutional rights, and is justified by their freedom to do those things which they think will better their condition.    It is no answer that it may not, in many instances, accomplish that end, or that it invariably damages the employer and interferes with his property rights.    Of course, a man has a property right in his business; so has a laboring man a property right equally sacred in his labor; and, when these rights conflict, there must, of necessity, be injury to one or the other, or both.    This is the result of conflicting opinion and an exigency of the contractual relation, for which the law furnishes no relief.

I am not unmindful of the rule of the common law that combinations of two or more persons to injure the rights of others were held to be illegal. But, if the injury there referred to be held to include the combination of two or more persons to withhold patronage from another, then the rule of the common law has long since been overruled by the courts of this country in dealing with strikes. I am aware that, at common law, a combination of two or more persons to do an unlawful thing, even if nothing is done in furtherance of the intent, is a conspiracy,—a substantive offense; while in the case of an individual, there can be no offense until there is some affirmative act tending to carry the intent into effect. But that has no bearing where the unlawful intent is the same, and the offense has actually been committed, either by the individual or by a number of persons combined together for that purpose.

The old rule that one may do lawfully what, if done by two or more persons in combination together may become unlawful, has been greatly modified in this country. It is a rule that gained currency at a time when even the right of assembly was looked upon with disapproval and suspicion. When this rule was first announced by the English courts, a labor union would not have been tolerated. In one of the early English cases, decided in 1721 (*Tubwomen* v. *Brewers of London,* 3 Columbia, L. Rev. 447), it was held to be a criminal conspiracy for two or more persons to combine together and refuse to continue to work for their employer unless he should comply with their demand for higher wages. In other words, it was held to be a criminal conspiracy for workmen to join together and strike. It was conceded in the same case that one person might abandon his employment if his demand was not complied with, but it was held unlawful for two or more persons to combine together for the purpose of demanding higher wages. It was held that such a combination constituted a criminal conspiracy. The same rule was applied as late as 1809 in New York, in the case of *Re Journeymen Cordwainers,* Yates, Sel. Cas. 111.

The right of laboring men to organize into unions, and the right of these unions to conduct peaceable strikes, is justified

because of their inability to compete singlehanded in contests
with their employers. In this competition, any peaceable and
lawful means may be resorted to, and it is only when the means
employed become unlawful that the courts will interfere. The
law recognizes the right of both labor and capital to organize.
The contest between employer and employee is one which courts
of equity should recognize as entitled to be fought out upon
the basis of equality; and the rule applied by the courts to the
strike is based, I think, upon that principle. The fundamental
principle underlying this contest is, that the employer who em-
ploys one thousand workmen is in possession of the same com-
petitive power to force those workmen to his terms as the one
thousand men, by the most powerful lawful organization, have
to force him into a compliance with their terms. The contest,
therefore, opens with the one on one side and a thousand on
the other upon a substantial basis of equality. The employer
has a property right in his business which he asks the courts
to protect, and which is entitled to protection. It consists,
among other things, in his right to employ whom he pleases.
That right extends to a discrimination against workmen of a
certain class, or to men belonging to labor organizations. He
may use in his business such types of machinery and appliances
as he may think adapted to carry on his work most successfully,
so long as they are reasonably safe and sanitary. The law pro-
tects him in these rights, and the courts will require others to
respect them. On the other hand, the thousand employees have a
property right in their labor, which is equally sacred with that
of the employer. They have a right to engage their services
wherever and to whomsoever they can secure the largest rewards
and the fairest treatment. They have a right to cease working
for their employer, with due regard for their contractual rela-
tions, when, in their judgment, they can better their condition
by so doing. They have a right to organize for this purpose, and
they have a right to advise others to join their organization,
and the law will protect them in the exercise of these rights
equally with the rights of the employer. The refusal of the
employees to work for the employer may result in his financial

ruin, but the loss will be no greater than the damage his refusal to employ the one thousand laborers may work in the aggregate upon them and those dependent upon their labor. In this contest between employer and employed, it should be remembered that the one who most strictly recognizes and observes the legal and equitable rights of the other, enters the struggle with tremendous odds in his favor.

Applying the same principle, I conceive it, to be the privilege of one man, or a number of men, to individually conclude not to patronize a certain person or corporation. It is also the right of these men to agree together, and to advise others, not to extend such patronage. That advice may be given by direct communication or through the medium of the press, so long as it is neither in the nature of coercion or a threat. As long as the actions of this combination of individuals are lawful, to this point it is not clear how they can become unlawful because of their subsequent acts directed against the same person or corporation. To this point, there is no conspiracy,—no boycott. The word "boycott" is here used as referring to what is usually understood as "the secondary boycott;" and, when used in this opinion, it is intended to be applied exclusively in that sense. It is, therefore, only when the combination becomes a conspiracy to injure by threats and coercion the property rights of another, that the power of the courts can be invoked. This point must be passed before the unlawful and unwarranted acts which the courts will punish and restrain are committed.

The definition of a boycott given by Judge Taft in *Toledo, A. A. & N. M. R. Co.* v. *Pennsylvania Co.* 19 L.R.A. 387, 5 Inters. Com. Rep. 522, 54 Fed. 730, is as follows: "As usually understood, a boycott is a combination of many to cause a loss to one person by coercing others, against their will, to withdraw from him their beneficial business intercourse, through threats that, unless those others do so, the many will cause similar loss to them." In *Gray* v. *Building Trades Council,* 91 Minn. 171, 63 L.R.A. 753, 103 Am. St. Rep. 477, 97 N. W. 663, 1118, 1 A. & E. Ann. Cas. 172, the word "boycott" is defined as follows: "A boycott may be defined to be a combination of several per-

sons to cause a loss to a third person by causing others, against their will, to withdraw from him their beneficial business intercourse through threats that, unless a compliance with their demands be made, the persons forming the combination will cause loss or injury to him; or an organization formed to exclude a person from business relations with others by persuasion, intimidation, and other acts which tend to violence, and thereby coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs. Such acts constitute a conspiracy, and may be restrained by injunction." In *Brace Bros.* v. *Evans,* 5 Pa. Co. Ct. 163, 3 Ry. & Corp. L. J. 561, it is said: The word itself implies a threat. "In popular acceptation it is an organized effort to exclude a person from business relations with others by persuasion, intimidation, and other acts which tend to violence, and thereby coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs." It will be observed that the above definitions are in direct conflict with the earlier English decisions, and indicate a distinct departure by our courts. This undoubtedly is in recognition of the right of a number of individuals to combine for the purpose of improving their condition. The rule of the English common law, from which we have so far departed, is expressed in *Bowen* v. *Hall,* L. R. 6 Q. B. Div. 333, as follows: "If the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is, in law and in fact, a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it."

From this clear distinction, it will be observed that there is no boycott until the members of the organization have passed the point of refusing to patronize the person or corporation themselves and have entered the field where, by coercion or threats, they prevent others from dealing with such person or corporation. I fully agree with this distinction. So long, then, as the American Federation of Labor, and those acting under its advice, refused to patronize complainant, the combination had not arisen to the dignity of an unlawful conspiracy or a boycott.

It is, therefore, the boycott, thus defined, with which we are here dealing, and not with the events that led to it. Hence, all that can be restrained are the acts which constitute the boycott and were incident thereto.

The unlawful conspiracy here consists in the membership of the American Federation of Labor banding together, not to cease dealing with the complainant or purchasing or using its products, but, by threats, to coerce others not to patronize the complainant, on penalty of the destruction of their business. What, up to this point, was the legitimate exercise of the right of freedom of contract, of free speech, and of a free press, now becomes destructive of property rights. The threats and actions of these defendants, as disclosed by this record, were as efficient in this instance to destroy the complainant's property in its right to do business with those against whom they were directed, as it would have been to bar its doors, or to place a guard to prevent, by physical force, the public from dealing with it. When a labor strike assumes the proportions of physical or threatened interference with the conduct of the former employer's business, either by physical force or destruction of property, or by threatening injury or destruction of business to others having dealings with such person or corporation, it assumes such proportions that a court of equity will intervene and restrain, not the combination, or its right of existence, but the unlawful acts. So, in this case, applying the same rule to the boycott, the American Federation of Labor, while not interfering with complainant's business by physical force or by destruction of property, has clearly been guilty of coercing and threatening those having business dealings with complainant, and there is abundant evidence of the defendants' conspiring together to do these unlawful acts. But the decree of the court should restrain the commission of the acts and specifically point out the offenses that should properly come under the decree, and not embrace within its commands such acts as may lawfully be performed by these defendants. In making this distinction, however, it should be remembered that threats of coercion and injury to property rights, to become actionable, need not be de-

clared in positive terms. It is sufficient if there is an unmistakable intimation that such injury will occur unless the demands be complied with. *Purvis* v. *Local No. 500, U. B. C. & J.,* 214 Pa. 348, 12 L.R.A.(N.S.) 642, 112 Am. St. Rep. 757, 63 Atl. 585, 6 A. & E. Ann. Cas. 275.

Assuming that we are asked to enjoin a conspiracy entered into by these defendants to destroy the business of complainant, or force it to their terms, surely there is nothing to invoke the interference of the court until the defendants reached a point where they were wrongfully jeopardizing the property rights of complainant, either by affirmative action, or by the threatening of such action. Until this point was reached, there was no unlawful conspiracy. It, therefore, certainly follows that acts done by defendants before the unlawful conspiracy was formed, were performed within their legal rights, and, when the unlawful acts cease, they will still be legal. The power of the court cannot, therefore, be invoked to restrain all the acts of defendants against complainant, embracing within its sweeping decree not only the unlawful, but the lawful, acts of the defendants in this connection. But it is said that the acts here complained of are incident to, and form a part of, the general conspiracy. It is the conspiracy that can be enjoined. Hence, only the forbidden acts which constitute the conspiracy can be embraced in the decree. The court has no power to perpetually restrain the defendants from doing anything which, separated from the unlawful acts constituting the conspiracy, is legal.

The courts of this country now recognize the legal right of laboring men to form unions for the protection and promotion of their interests, and deny the power to enjoin the members of such organizations from peaceably withdrawing from the service of their employer. Here we have clearly a combination of two or more individuals doing injury to the property rights of a third, which right the courts have upheld. This right is based upon the protection of the property which one man, or a combination of men, have in their business. As said by Justice Bradley in the *Slaughter-House Cases,* 16 Wall. 36, 21 L. ed. 394: "For the preservation, exercise, and enjoyment of these

rights, the individual citizen, as a necessity, must be left free to adopt such calling, profession, or trade as may seem to him most conducive to that end.   *   *   *   This right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, when chosen, is a man's property and right.   Liberty and property are not protected where these rights are arbitrarily assailed." Or, as was said in *Gray* v. *Building Trades Council*, 91 Minn. 171, 63 L.R.A. 753, 103 Am. St. Rep. 477, 97 N. W. 663, 1118, 1 A. & E. Ann. Cas. 172: "A person's occupation or calling, by means of which he earns a livelihood, and endeavors to better his condition and to provide for and support himself and those dependent upon him, is property within the meaning of the law, and entitled to protection as such, and, as conducted by the merchant, by the capitalist, by the contractor, or laborer, is, aside from the goods chattels, money, or effects employed and used in connection therewith, property in every sense of the word. Labor may organize, as capital does, for its own protection, and to further the interests of the laboring class. They may strike, and persuade and induce others to join them; but when they resort to unlawful means to cause injury to others with whom they have no relation, contractual or otherwise, the limit permitted by the law is passed, and they must be restrained." *In Beck* v. *Railway Teamsters' Protective Union,* 118 Mich. 516, 42 L.R.A. 407, 74 Am. St. Rep. 421, 77 N. W. 13, the court said: "It is conceded that courts of equity have jurisdiction to restrain conspiracies of this character when irreparable injury is sure to follow.   Suits at law would be inadequate, and a multiplicity of suits at law would arise.   Complainants were engaged in a lawful business, and carrying it on in a lawful manner.   They had done nothing to the defendants. or any of them, either illegal, immoral, or unjust.   They were paying wages to their teamsters in fact greater than union teamsters received, because they made no deductions for certain lost time, which the union employers made.   The law protects them in the right to employ whom they please, at prices they and their employees can agree upon, and to discharge them at the

D. C.]                    Concurring Opinion.

expiration of their term of service or for violation of their contracts. This right must be maintained, or personal liberty is a sham. So, also, the laborers have the right to fix a price upon their labor, and to refuse to work unless that price is obtained. Singly, or in combination, they have this right. They may organize in order to improve their condition and secure better wages. They may use persuasion to induce men to join their organization or to refuse to work except for an established wage. They may present their cause to the public in newspapers or circulars, in a peaceable way, and with no attempt at coercion. If the effect in such case is ruin to the employer, it is *damnum absque injuria,* for they have only exercised their legal rights. The law does not permit either party to use force, violence, threats of force or violence, intimidation, or coercion. The right to trade and the personal liberty of the employer alone are not involved in this case; the right of the laborer to sell his labor, when, to whom, and for what price he chooses, is involved."

It will be observed, therefore, that while the law sanctions combinations of laboring men for the purpose of bettering their condition, and accords to the union the same liberty in bestowing and withholding its benefits that it does to an individual, it only permits of peaceful means in the accomplishment of its ends, and will restrain not alone acts accompanied by violence, intimidation, or threats of violence, but where the means used are of a threatening nature, and intended to restrain those against whom they are directed, through fear of loss of property or personal violence, from exercising freely their rights.

The American Federation of Labor is not an unlawful organization *per se.* If the Federation, from the nature and terms of its organization, is one in restraint of trade, extending to interstate commerce, Congress, by the anti-trust act, has furnished an effective, speedy, and adequate remedy at law for its dissolution, to which, in that instance it should be made to respond, and not to a court of equity. It is not unlawful for citizens to organize together for any of the main purposes for which the American Federation of Labor exists. It is not unlawful for that order to have an official organ; it is not unlawful for that

organization, through the medium of that organ, to express free-ly its opinion as to the fairness or unfairness with which certain employers deal with their employees; and it is not unlawful for the paper to contain advice to the friends of labor not to patronize such employer. Again, we do not assume that it will be contended that a citizen has not perfect freedom to deal with whom he pleases, and withhold his patronage for any reason that he may deem proper, whether the reason be one originating in his own conscience, or through the advice of a neighbor, or through the reading of an article in a paper. Neither would it be unlawful for such citizen to advise another not to deal with a person with whom he has concluded not to continue his patronage. If this advice may extend to one, it may to a hundred; and the thing done will not be actionable so long as it is an expression of honest opinion, and not slanderous, however much the intercourse between this citizen and his neighbors may operate to injure the person against whom the advice is directed. As long as confined to a mere expression of opinion as to the fairness or unfairness of a business transaction, it is not actionable. Of course, such advice could not be directed to the honesty of purpose that actuated the employer, without making the person liable for slander or libel if the charge could not be justified. But it has never been held in this country that either slander or libel can be enjoined.

It is insisted that this entire movement by defendants against complainant is to better their own condition. This may be true. The improvement of their condition, however, can only be the result of the direct injury inflicted upon complainant, and the court will look to the direct consequences of defendants' actions, and not the probable indirect results. The court will not tolerate the unlawful acts of defendants to accomplish what would otherwise be a justifiable end. It is not the injury of complainant that measures the right of the court to intervene, for a peaceable, lawful strike may inflict great injury, but it is the unlawful actions of the defendants directed against the rights of the complainant. In the one instance, the defendants are exercising their lawful rights, and if damage incidentally

occurs to others, it is due to a conflict of lawful interests. In the other case, the actions are unlawful, and no resulting advantage can justify the court in overlooking a breach of the law.

No one doubts, I think, the right of the members of the American Federation of Labor to refuse to patronize employers whom it regards as unfair to labor. It may procure and keep a list of such employers, not only for the use of its members, but as notice to their friends that the employers whose names appear therein are regarded as unfair to labor. This list may not only be procured and kept available for the members of the association and its friends, but it may be published in a newspaper or series of papers. To this extent they are within their constitutional rights; at least, where a court of equity cannot intervene. But, as soon as, by threats or coercion, they attempt to prevent others from patronizing a person whose name appears on the list, it then becomes an unlawful conspiracy,—a boycott.

Let us assume, therefore, that the object of the Federation in publishing complainant's name in the "Unfair" or "We Don't Patronize" list in the Federationist was a part of this conspiracy, and was notice to each other and to others that the boycott would be extended to persons patronizing the complainant. No one would contend but that the unlawful feature of the publication would consist not in the fact that a list of names had been published, among which was the name of the complainant, but in the object of the publication of complainant's name therein. As to defendants, it would become one of the steps in the conspiracy. While I have no doubt from this record that the publication of complainant's name in the list may be restrained, I also entertain no doubt in asserting that the publication of the paper, and its delivery and distribution through the mails or otherwise, under the facts in this case, cannot be restrained.

Conceding, then, that the name of complainant was published in the "We Don't Patronize" or "Unfair" list of employers in the American Federationist for the purpose of notifying not only the members of the American Federation of Labor, but dealers generally, to withhold patronage from complainant on

penalty of having a boycott inaugurated against such dealers,—
and on this I think there is sufficient in the record to support
such an interference,—the most a court could do would be to re-
strain the publication in the list of the name of complainant,
together with any other article or articles in the American
Federationist published in pursuance or furtherance of the boy-
cott.   Without the existence of the boycott, the court would be
powerless to reach the paper.   Hence, its power to restrain any
publication appearing therein can only be upheld when it is
clearly apparent that such publication is in support or further-
ance of the boycott, and the restraining order must be limited
to the particular article or articles so published in furtherance
of the boycott, and cannot extend to the paper itself.   Is that
what was done ?   The decree restrains the defendants "from
printing, issuing, publishing, or distributing through the mails,
or in any manner, any copies or copy of the American Federa-
tionist, or any other printed or written newspaper, magazine,
circular, letter, or other document or instrument whatsoever,
which shall contain or in any manner refer to the name of
the complainant, its business or its product in the 'We Don't
Patronize' or the 'Unfair' list of the defendants, or any of them,
their agents, servants, attorneys, confederates, or other person
or persons acting in aid of or in conjunction with them, or which
contains any reference to the complainant, its busines or prod-
uct, in connection with the term 'Unfair' or with the 'We
Don't Patronize' list, or with any other phrase, word, or words
of similar import, and from publishing or otherwise circulating,
whether in writing or orally, any statement or notice of any
kind or character whatsoever, calling attention to the complain-
ant's customers, or of dealers or tradesmen, or the public, to any
boycott against the complainant, its business or its product, or
that the same are or were or have been declared to be 'Unfair,'
or that it should not be purchased or dealt in or handled by any
dealer, tradesman, or other person whomsoever, or by the public,
or any representation or statement of like effect or import, for
the purpose of, or tending to, any injury to or interference with
the complainant's business, or with the free and unrestricted

sale of its product, or of coercing or inducing any dealer, person, firm, or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession stoves, ranges, heating apparatus, or other product of the complainant."

The sustaining of such a decree by a court of equity would violate the constitutional rights of the citizen. It would mark the beginning of the era of judicial tyranny by the branch of the government charged with the duty of protecting the citizen in his constitutional and legal rights. The clause in the Constitution guaranteeing free speech and a free press was placed there to prevent a repetition of the abuses that had grown up in the monarchies of Europe,—government censorship of the press. It is folly to assert that this provision of the Constitution is a mere inhibition on Congress from passing any law abridging the freedom of speech and the freedom of the press. It forbids government censorship in all forms, and it would be difficult to conceive of a more effective method of establishing a government censorship than through the writ of injunction. For the violation of its commands, the contemnor can be dealt with in the most summary manner,—tried, adjudged, and sentenced by the judge whose order has been disobeyed. The right of the citizen to express his opinions in the way of just criticism, either orally or through the press, is a privilege that cannot be abridged. This right is as essential to his liberty as the right to choose his calling. It may not be assailed even by the courts. The right is equally sacred, whether exercised individually or in conjunction with others.

To hold, however, that the court is powerless, because of the constitutional inhibition, to restrain publications in furtherance of a conspiracy to boycott, is equivalent to a declaration that a court of equity is powerless to restrain the unlawful conspiracy. The conspiracy here consists of declarations and publications in the nature of threats to coerce innocent persons into withholding patronage from complainant. If the Constitution forbids the restraint of the publications under the protection of a free press, it would for the same reason prohibit the restraint of the declarations under the guaranty of free speech.

They are both equally sacred in the eyes of the Constitution. They are coupled together in the same Amendment, and must stand or fall together. The jurisdiction of the court to limit or restrain one will extend with equal force to the other. To hold that the court is powerless to restrain the publications renders the decree against oral threats nugatory; for it leaves the defendants in a position where they may obey the decree as to oral threats, but accomplish all the objects of the unlawful conspiracy by promulgating the threats through the medium of the press.

I agree fully that the record discloses a state of facts calling for equitable relief, but the decree of the supreme court of the District should be modified so as to apply only to the unlawful acts of defendants as established by the record. It should only restrain the conspiracy, which, in this case, consists of threatened damage to persons having business dealings with complainant, or threats directed against complainant corporation which tend to prevent others from freely transacting business with it. The publications complained of, not being in themselves subject to equitable restraint, the decree should only restrain these publications as an incident to and in furtherance of the conspiracy. With these modifications, as embraced in the modified decree set forth in the opinion, I concur.

Mr. Chief Justice SHEPARD, dissenting in part:

Unable to concur entirely in the modified decree directed to be entered in this case, it is proper to state the grounds of my conclusion.

1. A conspiracy is rightly defined to be a combination of two or more persons to accomplish something that is unlawful, or to accomplish something that is not unlawful by the use of unlawful means.

The logical deduction is, that a thing which is lawful when done by one person does not become unlawful when done by two or more persons in combination, provided no unlawful means are agreed upon or used. This doctrine having been denied by

some of the English judges, in cases arising out of trades disputes, it was finally settled by act of Parliament. The 6th section of the statute, adopted December 21, 1906, reads as follows: "An act done in pursuance of an agreement or combination by two or more persons shall, if done in contemplation or furtherance of a trade dispute, not be actionable unless the act, if done without any such agreement or combination, would be actionable." Public Acts 6 Edw. VII. chap. 47. The courts of this country, without the aid of statute, have now generally agreed that this is the doctrine of the common law. It has been declared by McSherry, Ch. J., as follows: Employees have a perfect legal right to fix a price upon their labor, and to refuse to work unless that price is obtained. They have that right both as individuals and in combination. They may organize to improve their condition, and to secure better wages. They may even use persuasion to have others join their organization. They have an unquestionable right to present their cause to the public in newspapers or circulars in a peaceable way, but with no attempt at coercion. If ruin to the employer results from their peaceable assertion of these rights, it is a damage without remedy. But the law does not permit either employer or employee to use force, violence, threats of force or threats of violence, intimidation or coercion. *My Maryland Lodge No. 186 of Machinists* v. *Adt* (1905) 100 Md. 238, 249, 68 L.R.A. 752, 59 Atl. 721; see also, *National Protective Asso.* v. *Cumming,* 170 N. Y. 315, 321, 58 L.R.A. 135, 88 Am. St. Rep. 648, 63 N. E. 369, and dissenting opinion of Vann, J., at p. 339.

2. One person may not only cease to labor for another without liability to action, but may also cease or decline to further purchase his goods, or to have any business relations with him.

This, being lawful for one person to do, does not become unlawful when two or more persons, impelled by a like motive, voluntarily agree to do the same thing. Consequently, the persons composing the organization of the Federation of Labor had a legal right to agree together not to purchase the goods of the Buck's Stove & Range Company. Refusing to purchase those goods does not constitute a "boycott" in the legal sense. A boy-

cott, in this sense, must amount to what has been sometimes called a "secondary boycott." In the language of Brown, J., delivering the opinion of the supreme court of Minnesota: "A boycott may be defined to be a combination of several persons to cause a loss to a third person by causing others, against their will, to withdraw from him their beneficial business intercourse through threats that, unless a compliance with their demands be made, the persons forming the combination will cause loss or injury to him; or an organization formed to exclude a person from business relations with others by persuasion, intimidation, and other acts, which tend to violence, and thereby cause him, through fear of resulting injury, to submit to dictation in the management of his affairs." *Gray* v. *Building Trades Counsel,* 91 Minn. 171, 179, 63 L.R.A. 753, 103 Am. St. Rep. 477, 97 N. W. 663, 1118, 1 A. & E. Ann. Cas. 172; see also *My Maryland Lodge No. 186 of Machinists* v. *Adt,* 100 Md. 248, 68 L.R.A. 752, 59 Atl. 721; 8 Cyc. Law & Proc. p. 639.

So long, therefore, as the members of the Federation of Labor contented themselves with refusing to purchase the goods of the Buck's Stove & Rrange Company, from it or from others, their combination was not illegal. But when they exceeded that limit and extended their purpose to the attempted coercion of other persons to compel them, against their will, to cease business relations with the company, the combination became unlawful. It is unlawful for one man to do such an act, and a combination of two or more to do it becomes a conspiracy as heretofore defined. That there was such a conspiracy is shown by the evidence of the attempts made to coerce the St. Louis House-furnishing Company and other customers of the Buck's Stove & Range Company, into refusing to have further business relations with that company; which attempts were successful in several instances. To constitute this coercion, I do not consider it essential that it shall amount to violence or threats of violence to person or property. It may consist of any act or acts reasonably calculated to overcome the will of the party operated upon. In many instances, as illustrated by the testimony in this case, threats to cease all business relations with an independent dealer

unless he shall cease to do business with a party named by the threateners may be as effective to compel him to take action against his judgment and will, as threats of actual violence. To the extent that all such coercion of third persons is restrained, I concur in the modified decree.

3. Assuming that the publication of the Buck's Stove & Range Company in the "We Don't Patronize" column of the American Federationist was a step in the formation of a conspiracy to coerce independent dealers into refusing to have further business relations with that company, I cannot agree that the publication can be restrained for that reason. Regardless of its character or purpose, the publication is protected from restraint, in my opinion, by the 1st Amendment of the Constitution, which forbids any law abridging the freedom of the press.

The liberty of the press became an established principle of the British Constitution after a long and arduous struggle, and consists in complete freedom from any kind of restraint. In the language of Macaulay, it "has done more for liberty and civilization than the Great Charter or the Bill of Rights." DeLolme, whose treatise was published before our Constitution was framed, defined its meaning as follows: "The liberty of the press, as established in England, consists   *   *   *   in this, that neither the courts of justice nor any other judges whatever are authorized to take notice of writings intended for the press, but are confined to those which are actually printed, and must in these cases proceed by the trial by jury." Const. of England, -chap. 10. Blackstone discusses the principle thus: "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this is to destroy the freedom of the press; but, if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity. To subject the press to the restrictive power of a licensor, as was formerly done, both before and since the revolution, is to subject all freedom of sentiment to the prejudices of

one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government. But to punish (as the law does at present) any dangerous or offensive writings which, when published, shall, on a fair and impartial trial, be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion,—the only solid foundations of civil liberty. Thus the will of individuals is still left free: the abuse only of that free will is the object of legal punishment. * * * The only plausible argument heretofore used for the restraining the just freedom of the press, 'that it was necessary to prevent the daily abuse of it,' will entirely lose its force when it is shown (by a seasonable exertion of the laws) that the press cannot be abused to any bad purpose without incurring a suitable punishment: whereas it never can be used to any good one when under the control of an inspector. So true it will be found that to censure the licentiousness, is to maintain the liberty, of the press." 4 Bl. Com. 151.

The framers of our State and Federal Constitutions were compelled to choose between the danger to free institutions that would result from any abridgment of the freedom of the press, and the evils that attend the abuse of that freedom through the frequent publication of matter calculated to wound feelings, injure character and rights of property, and provoke the disturbance of the peace. They preferred to risk the latter evil. For it there is some remedy, though often inadequate, through civil actions and criminal prosecutions. On the other hand, there is no remedy for the mischief of censorship and restraint.

"It has, accordingly," says Chancellor Kent, "become a constitutional principle in this country that 'every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and that no law can rightfully be passed to restrain or abridge the freedom of speech or the press.' " 2 Kent, Com. 17. Courts of equity cannot act as censors of the press, or abridge its freedom by the exercise of any character of restraint. They have no inherent power to exercise a jurisdiction that the Constitution forbids to be con-

ferred upon them. They have invariably denied their jurisdiction to restrain the publication of libels of any and every character. This has been sometimes ascribed to the principle that they have no jurisdiction to prevent the commission of crime; but this is not a satisfactory explanation. Undoubtedly, a court of equity has no criminal jurisdiction, and will not undertake to restrain the commission of a crime merely. But, when the threatened criminal act will also work an irreparable injury to property or rights of a pecuniary character, the jurisdiction to restrain or arrest its commission is equally undoubted. *Re Debs,* 158 U. S. 564, 593, 39 L. ed. 1092, 1105, 15 Sup. Ct. Rep. 900. The publication of libelous matter is a criminal act, but it frequently, if not generally, also, works a serious injury to property rights. In case, then, of a threatened publication of a libel from which pecuniary injury would necessarily flow, there must be found some other ground for the denial of jurisdiction to prevent the injury.

The true ground for the denial of jurisdiction to restrain the publication of a libel destructive of property is that the exercise of such jurisdiction would amount to an abridgment of the freedom of the press by establishing a censorship over the press so enjoined. The soundness of this view is demonstrated in an able opinion by Fenner, J., speaking for the supreme court of Louisiana, in such a case. *State ex rel. Liversey* v. *Civil Dist. Judge,* 34 La. Ann. 741, 745. He says: "There would be no safe course, except to take the opinion of the judge beforehand, or to abstain entirely from alluding to the plaintiff. What more complete censorship could be established? Under the operation of such a law, with a subservient or corrupt judiciary, the press might be completely muzzled, and its just influence upon public opinion entirely paralyzed. Such powers do not exist in courts, and they have been constantly disclaimed by the highest tribunals of England and America. It has passed into a settled rule of jurisprudence that 'courts of equity will not lend their aid to enjoin the publication of libels or works of a libelous nature; even though the libelous publication is calculated to in-

jure the credit, business, or character of the person against whom it is directed.' "

In view, then, of the provision of the 1st Amendment, I can come to no other conclusion than that the only remedy for libelous, or otherwise malicious, wrongful, and injurious publications is by civil action for damages, and criminal prosecution. There is no power to restrain the publication.

For the reasons given I cannot agree to the terms of the decree as modified. In my opinion, it should be modified so as to restrain the acts, only, by which other persons have been or may be coerced into ceasing from business relations with the Buck's Stove & Range Company; but so as not to restrain the publication of the name of that company in the "We Don't Patronize" columns of the American Federationist, no matter what the object of such publication may be suspected or believed to be.

In what has been said, I am not to be understood as intimating that, because a publication of any character cannot be restrained, it may not become actionable or punishable by some one of the processes of the law, when shown to have been made as an act, or one of a series of acts, in furtherance of the objects of an ascertained conspiracy. That question is not involved.